# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 23, 2018 Session[1]

**BENJAMIN SHEA COTTEN, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF CHRISTINA MARIE COTTEN, DECEASED, ET AL.**
**v.**
**JERRY SCOTT WILSON**

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Williamson County**
**No. 2015-194          Michael W. Binkley, Judge**

_____

**No. M2016-02402-SC-R11-CV**

_____

In this wrongful death action, the plaintiff estate seeks to hold the defendant liable for negligently facilitating the decedent's suicide. While staying alone in the defendant's home, the adult decedent committed suicide by shooting herself with a gun that was unsecured in the defendant's home. The decedent's estate sued the defendant, alleging that he should have known the decedent was potentially suicidal and that he negligently facilitated the suicide by failing to secure the gun while the decedent was in his home. The trial court granted summary judgment in favor of the defendant, and the Court of Appeals reversed. We hold that the evidence is insufficient for a trier of fact to find that the decedent's suicide was a reasonably foreseeable probability; consequently, the decedent's suicide constitutes a superseding intervening event that breaks the chain of proximate causation. Accordingly, we reverse the Court of Appeals and affirm the trial court's grant of summary judgment in favor of the defendant.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Affirmed**

_____

[1] We heard oral argument in this case at Tennessee Technological University in Cookeville, Tennessee, as part of the Tennessee American Legion Boys State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK and ROGER A. PAGE, JJ., joined. SHARON G. LEE, J., filed a dissenting opinion.

Christopher M. Jones and Britney K. Pope, Nashville, Tennessee, for the Defendant/Appellant, Jerry Scott Wilson.

H. Douglas Nichol, Knoxville, Tennessee; and John Chadwick Long, Gallatin, Tennessee, for the Plaintiff/Appellee, Benjamin Shea Cotten, as personal representative for the Estate of Christina Marie Cotten, deceased.

## OPINION
### FACTUAL AND PROCEDURAL BACKGROUND[2]

Benjamin Shea Cotten and the decedent, Christina Marie Cotten ("Christina"),[3] were married in 2006. Together they had a son in 2010.

Later in 2010, Christina became a registered nurse and began working as a psychiatric nurse in the Military Unit at Skyline Hospital in Nashville, Tennessee. While working at Skyline, she met Defendant/Appellant Dr. Jerry Scott Wilson ("the Defendant"), a board-certified psychiatrist. The Defendant was the director of the Military Unit in which Christina worked. In May 2011, Christina and the Defendant began an affair.

After Mr. Cotten discovered that Christina was having an affair with the Defendant, Mr. Cotten and Christina separated. Eventually, the affair led to the demise of their marriage. In June 2012, Christina's divorce from Mr. Cotten was finalized. The

---

[2] The trial court granted the Defendant's motion for summary judgment; consequently, it resolved no factual disputes and instead relied only on the undisputed facts in the record. In this opinion, we state the facts in the manner in which they are set out by the trial court and as supported in the parties' statements of undisputed material facts, the responses thereto, and the attached exhibits, all of which are contained in the appellate record. Many facts were designated as undisputed "for summary judgment purposes only," and factual disputes will be noted. In reviewing a grant of summary judgment, we give the non-movant the benefit of all reasonable inferences and view all facts in a light most favorable to the non-movant. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015).

[3] Because the decedent had the same last name as the representative plaintiff in this action, we refer to her by her first name for purposes of clarity. We intend no disrespect by this reference.

divorce decree provided for Christina and Mr. Cotten to exercise equal parenting time with their son.

Meanwhile, the relationship between Christina and the Defendant continued. In October 2013, Christina was evicted from the place where she was living for failure to pay rent. She then moved into the Defendant's home in Nashville.

Subsequently, the Defendant noticed that Christina was having frequent crying spells and seemed to be struggling with eviction, job loss, and her new job not working out. She was not as energetic and motivated as she once was, and on certain days she did not take care of herself.

In late 2013, Christina informed the Defendant that she had sought treatment for depression and anxiety from Dr. Roy Asta, a psychiatrist who had worked with both the Defendant and Christina at Skyline Hospital. Christina visited Dr. Asta twice in 2013, once in March and once in June. The Defendant knew Christina was taking Prozac and Klonopin at the end of 2013.

In early 2014, the Defendant was making plans to move into a new house in Franklin, Tennessee; Christina intended to move to Franklin with him. On January 23, 2014, Mr. Cotten filed a petition in state court for primary custody of his son because of Christina's plan to move to Franklin.

A few days after Mr. Cotten's petition was filed, on the evening of January 26, 2014, Christina's friends[4] took her to the emergency room of Metro Nashville General Hospital based on Christina's overdose of Ativan and the consumption of nearly a full bottle of wine.[5] Lab reports confirmed that Christina had both alcohol and benzodiazepines in her system. Christina was diagnosed with depression, anxiety disorder, acute alcohol intoxication, and medication overdose. Although Christina initially denied that she was attempting to commit suicide, the attending physician was of

_____

[4] Kami Turner, Christina's best friend, was one of the friends who took Christina to the hospital.

[5] One of the Estate's statements of undisputed fact indicates that Christina's friends initially gave the emergency room physician a "history . . . of [Christina] trying to hurt herself." It is unclear whether this "history" refers to a previous incident of self-harm or whether it refers to Christina's attempt to hurt herself on this occasion. The appellate record contains neither Christina's past medical records nor any indication of a past incident of self-harm. Regardless, there is no indication in the record that the Defendant had knowledge of any such previous attempt. As detailed below, the relevant inquiry in this appeal necessarily focuses on what information the Defendant knew during the relevant time frame.

the opinion that Christina had attempted suicide and was a suicide risk. Consequently, Christina was moved to Middle Tennessee Mental Health Institute (MHI), a state funded psychiatric hospital, for inpatient psychiatric treatment and further evaluation and monitoring.

After arriving at MHI, Christina was evaluated by Dr. Philip Brooks, a psychiatrist. He found her to be somewhat embarrassed and distraught. Christina called the Defendant and told him that she was being admitted to MHI. She denied that she had tried to commit suicide and explained to the Defendant that she had passed out from drinking and taking a couple of extra sleeping pills. The Defendant then spoke on the telephone with Dr. Brooks. The MHI medical records contain the following note: "[Medical Officer of the Day] spoke[ ] with boyfriend (Dr. Jerry Wilson), and boyfriend assured her safety especially since they lived together. Patient will see her Outpatient Psychiatrist within seven days." It was Dr. Brooks' understanding that the Defendant would pick Christina up and take her home with him. The Defendant assured Dr. Brooks that Christina would follow up with her outpatient psychiatrist within the allotted seven days.[6] Dr. Brooks then told Christina that she was being released on the condition that she would follow up with her psychiatrist. One reason Dr. Brooks decided to discharge Christina was that he knew she was going home with the Defendant; the fact that the Defendant promised that Christina would follow up with an outpatient psychiatrist had a huge bearing on Dr. Brooks' decision to send Christina home.

Neither the Defendant nor Dr. Brooks informed Dr. Asta of Christina's suicide attempt. Although Christina had initially denied that she attempted suicide, she later admitted to the Defendant that she actually had been contemplating suicide at the time of her January 2014 hospitalization.

In February 2014, Christina and the Defendant moved to the Defendant's new house in Franklin. In April 2014, Mr. Cotten's petition for majority parenting time was granted.[7]

---

[6] These facts are considered undisputed only for purposes of summary judgment.

[7] The undisputed facts for summary judgment purposes indicate that Mr. Cotten's modification petition was based on Christina's imminent move to Franklin. The record does not reflect the court's reasoning for the decision to modify the Cottens' parenting arrangement.

- 4 -

In June 2014, the Defendant noticed that Christina was having frequent crying spells because of the loss of equal parenting time with her son. The crying spells were varied, usually once or twice a week. She wanted to sleep a lot and she ruminated on the loss of parenting time; Christina's depression was extremely variable.

Around that same time period in June 2014, over a year after her previous visit, Christina went to Dr. Asta for treatment for the first time since her suicide attempt. She was doing poorly and was in distress and crying. He continued her on the same treatment and increased some medication.

Prior to mid-August 2014, the Defendant had told Christina that he no longer trusted her and did not feel he would ever be able to regain trust in her. He told her she was not making good decisions and was constantly putting their families in jeopardy. In mid-August 2014, the Defendant broke up with Christina; he told her that he did not see a future for their relationship and that it was "time to move on." He helped Christina pack her things, and she moved out of his home. Christina was upset about the break-up. However, the two still had an off-and-on relationship. They talked, texted, emailed, had physical relations, and occasionally talked about reconciling. During the months after the break-up, Christina spent the night with the Defendant five or six times.

Meanwhile, on August 29, 2014, Christina visited Dr. Asta again. She reported to him that she had broken up with her boyfriend, whom Dr. Asta knew to be the Defendant. She described the relationship as "being rocky." Dr. Asta noted that Christina was doing well on that occasion.

On October 14, 2014, Christina made her last contact with Dr. Asta. She called him for refills of her medication, and she told Dr. Asta she was planning to move back in with the Defendant. Dr. Asta recorded in his notes that he specifically asked Christina whether she had suicidal ideations, and she said that she had none. When asked whether he ever questioned Christina's truthfulness, Dr. Asta said he did not because Christina "seemed pretty reliable." Christina never told Dr. Asta about her January 2014 suicide attempt, and he did not learn about it until after her death. Dr. Asta never contacted the Defendant to discuss his (the Defendant's) relationship with Christina.

In October 2014, the Defendant's father gave him an old 32 revolver handgun and some ammunition for protection.[8] The Defendant stored the gun and ammunition in a china cabinet buffet in his dining room area; the gun was concealed in a sock in one drawer, and the ammunition was concealed in a sock in a different drawer.

On October 26, 2014, the Defendant, Christina, and Christina's son went out to lunch and then returned to the Defendant's house. While Christina and her son were in the den, the Defendant retrieved the handgun from the china cabinet and took it to the den to show it to Christina and her son.[9] The Defendant told Christina it was referred to as a lady's purse gun and told her a little history. He also told Christina the reason he had the gun was that he was concerned for his own safety. He explained that he had been assaulted before, and he also said that he was concerned about the chaotic relationship between Christina and Mr. Cotten. Christina handled the gun. Afterwards, the Defendant took the gun back to the china cabinet. The gun was out of the china cabinet for ten to fifteen minutes. Although the undisputed evidence shows that the dining room was adjacent to the den, it is unclear whether Christina saw where the Defendant kept the gun at that time.[10]

Later that same evening, the Defendant told Christina he was interested in pursuing a relationship with another woman. He did this because Christina had brought some things to his house for Halloween and he felt that Christina was "trying to nest again." Christina became upset and accused the Defendant of "just using her for sex." She then left abruptly, storming out the door. Nevertheless, Christina and the Defendant continued to talk and had mixed feelings about reconciling.

A few days later, around October 29, 2014, Christina's son told his father, Mr. Cotten, that the Defendant "had guns and was fighting with [Christina]." Mr. Cotten

---

[8] Defendant also had a second gun, an antique 44 magnum, which he displayed in his home in Franklin as a collectible/antique firearm. He kept the second gun unloaded, and he did not have any ammunition for it in the house. The second gun is not at issue in this appeal.

[9] Some evidence in the record indicates that Christina was a gun enthusiast, but this fact is disputed.

[10] The Defendant claims that, although Christina was aware that he owned the gun and ammunition, he never told Christina where he kept them. Mr. Cotten disputes this claim because "[t]he den is adjacent to the dining room where [the Defendant] went to first get the handgun and then took it back." Therefore, it appears Mr. Cotten assumes Christina knew where the gun was kept based on the proximity of the den to the dining room.

became concerned about Christina and called the police to request a welfare check on her. Apparently operating under the mistaken belief that Christina was still living with the Defendant, Mr. Cotten told Christina that he was considering asking the court to have her visits with their son supervised if she continued to live with the Defendant.[11]

About a week later, around November 1, 2014, Christina was evicted from her friend's apartment. She contacted the Defendant, who was out of town on a business trip, and asked to stay at his house because she did not have anywhere to live. The Defendant let Christina stay at his house because she had nowhere else to go.

On Wednesday, November 5, 2014, the Defendant returned to his house while Christina was still staying there. The Defendant spent one night at his house with Christina. The next morning, he went to stay at his parents' house in Harrogate, Tennessee, a few hours away. According to the Defendant, Christina appeared to be in good spirits when he left; she commented about her friends and her new job. That Friday, November 7, the two exchanged "pleasant" text messages about their relationship and other things. She sent him a "funny dog pic" and a message about a television show. Subsequently, Christina went "off the radar" until the Defendant received a text message from her Sunday morning, which indicated no problems.

That weekend, Mr. Cotten had trouble communicating with Christina. On that Friday, November 7, 2014, Christina was expected to pick up her son from Mr. Cotten's mother to exercise parenting time with him that weekend at Christina's father's house. Christina called Mr. Cotten's mother on Friday, however, and said that she was stuck in

---

[11] Unfortunately, the dissent recites some statements of undisputed fact proposed by the Defendant even though the Estate made valid objections to them. Significantly, the dissent relies to a great extent on the Defendant's proposed undisputed Fact No. 11, which says: "The threat of losing more time with her son caused Ms. Cotten to become further emotionally distraught," asserting that this fact relates to October 2014, the time period shortly before the Defendant agreed to allow Christina to stay in his home. However, the Estate objected to this proposed fact on the basis that it was "not contained in the references as cited," *i.e.*, it was not supported by the deposition testimony cited as support for it. The Estate's objection explained that it did not dispute "that [Christina] *in June 2014* was having frequent crying spells after she was stripped of custody of her child" and "[t]hat she was wanting to sleep a lot and ruminated on the loss of her child." (Emphasis added). As implied in the Estate's objection, the deposition testimony of Mr. Cotten and the Defendant cited to support the proposed undisputed fact that Christina became "further emotionally distraught" did not relate to October 2014 at all; instead, it related to Christina's emotional distress many months earlier, in June 2014, shortly after Mr. Cotten first obtained primary custody of their son. Most important, as discussed in our analysis below, the record says nothing about whether the Defendant knew anything about Mr. Cotten's October 2014 conversation with Christina about supervised custody or Christina's response to it.

traffic and would pick her son up the next day. Christina never called Mr. Cotten's mother after that, and she never went to pick up her son. Mr. Cotten became concerned when Christina did not show up. He texted Christina a few times but never heard back from her. On Sunday, Mr. Cotten sent a text message to Christina telling her that he was going to call the police if he did not hear from her, but he never got a response. Mr. Cotten did not call the police, however, because he did not expect that anything was seriously amiss.

On Sunday, November 9, 2014, the Defendant returned home around 3:00 or 4:00 in the afternoon. He said that he was surprised to see Christina's car in his garage, because "[i]t was [his] understanding that [Christina] was going to be at her dad's with her son that weekend." He entered the house and yelled for Christina but got no response. Eventually the Defendant found Christina upstairs, lying in a bed, unconscious from a self-inflicted gunshot wound to the chest. He found his loaded gun in the bed near Christina. The Defendant called 9-1-1 and began CPR. Despite these efforts, Christina did not survive.

Much later, during the pendency of this lawsuit, emails and photos were discovered on Christina's computer indicating that she had been involved in prostitution and/or X-rated filmmaking for over a year prior to her death, "back to 2013." She engaged in this conduct without the knowledge of Mr. Cotten, the Defendant, or any of her close friends.[12] Both Mr. Cotten and the Defendant formed the opinion that Christina had been living a "double life" for over a year.

On May 4, 2015, Mr. Cotten, as representative of Christina's estate, filed this wrongful death negligence lawsuit against the Defendant.[13] In the complaint, the Estate claimed that the Defendant, as a homeowner, owed a duty to Christina to properly store and maintain his firearm in a safe manner and condition. The Estate further claimed the Defendant knew or reasonably should have known that, if Christina had access to the firearm, there would be a great likelihood that she would harm herself, particularly because he knew of her fragile mental state and suicidal tendencies. The allegations in the complaint centered on the Defendant's allegedly negligent maintenance and storage of a firearm. The complaint alleged that the Defendant was negligent by:

---

[12] It appeared that Christina's best friend, Kami Turner, was also unaware of Christina's illicit conduct.

[13] Hereinafter, we will refer to Mr. Cotten as "the Estate" when discussing him in his capacity as the plaintiff or as the representative of Christina's estate.

A. Keeping a firearm in the residence while Christina was residing there;

B. Failing to properly lock the firearm in a locked cabinet, safe, gun cabinet, or storage case to prevent access by Christina;

C. Failing to utilize a gun lock on the firearm;

D. Maintaining the firearm loaded with ammunition;

E. Failing to store the ammunition in a separate location from the firearm;

F. Failing to store the ammunition in a locked storage container; and

G. Keeping the firearm and ammunition in locations known and accessible to Christina.

The Estate further claimed that the Defendant's actions constituted gross negligence, justifying an award of exemplary damages. The Estate asserted that the Defendant's negligence was the sole and proximate cause of Christina's death.

In his answer, the Defendant admitted that he was aware Christina "suffered from depression and other possible psychiatric issues," but he denied committing any negligent act or omission and denied owing Christina any duty of care. The Defendant claimed Christina's suicidal actions constituted an unforeseeable intervening, superseding act for which he was not liable. The Defendant also asserted Christina's comparative fault as a defense.[14]

On April 8, 2016, the Defendant filed a motion for summary judgment. He claimed he was entitled to a judgment as a matter of law on the undisputed facts for several reasons: (1) he did not owe Christina a duty of care because Christina's suicide was not reasonably foreseeable and because he did not have a special relationship with Christina; (2) even if he had a duty of care to Christina, he did not breach that duty

---

[14] Under the doctrine of modified comparative fault, a plaintiff can recover so long as the plaintiff's negligence is less than the defendant's. *McIntyre v. Ballentine*, 833 S.W.2d 52, 57 (Tenn. 1992).

because of the concealed and unloaded manner in which he stored his gun and, in any event, he could not have reasonably foreseen that she would use the gun to take her own life; (3) he was not the sole cause-in-fact and/or proximate cause of Christina's death, and he was at least not more at fault than Christina under the doctrine of comparative fault; and (4) Christina's intentional act of suicide was an independent intervening cause of her death that precluded his liability.

In September 2016, the trial court conducted a hearing on the Defendant's motion for summary judgment. On October 21, 2016, the trial court entered a written order granting the motion.

The trial court first held, as a matter of law, that the Defendant did not owe a duty to Christina. The trial court concluded that the Defendant, as a homeowner and a gun owner, did not owe a duty to Christina regarding the manner in which he cared for and stored his gun because the record contained "no proof that, at the time of [Christina's] death, it was foreseeable she would commit suicide" or that Christina "would use [the Defendant's] gun to commit suicide." The trial court also granted summary judgment in favor of the Defendant on the Estate's claim that the Defendant was negligent for his failure to follow up on Christina's mental health treatment after she was discharged from MHI in January 2014.[15] This claim, the trial court decided, was based on the Defendant's failure to act, i.e., nonfeasance. The trial court observed that a person who has a special relationship with the plaintiff has an affirmative duty to protect the endangered person, but it held the Defendant had no such affirmative duty regarding the "nonfeasance" claim of failure to ensure Christina's follow-up care because "there [was] no relationship [between Christina and the Defendant] sufficient enough to impose a duty on [the Defendant]."

The trial court then determined the Defendant was entitled to summary judgment for an additional reason. It held the Defendant's conduct was neither the cause-in-fact nor the proximate cause of the Christina's death. It noted that Tennessee courts "have consistently recognized that the independent intervening cause doctrine may properly be invoked in cases involving self-inflicted injury or death." (Quoting *Rains v. Bend of the River*, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003)). Although there are exceptions to

---

[15] Initially, the complaint filed by the Estate contained allegations of negligence related to gun maintenance and storage. Over the course of the lawsuit, the Estate's allegations broadened to include allegedly negligent acts that occurred from January 2014, when Christina was released from MHI, until her death in November 2014.

this general rule, the trial court held, none of them apply in this case because Christina's suicide was not reasonably foreseeable:

> After reviewing the undisputed facts, the Court concludes [the Defendant] was not a substantial factor in bringing about [Christina's] suicide, nor was [Christina's] suicide reasonably foreseeable. As previously discussed, while it is undisputed [Christina] attempted suicide in January 2014, there is nothing in the record which reveals [Christina's] mental state, sheds light on her mental struggles, or demonstrates she was a continued suicide risk from January 2014 to November 2014. Instead, on the weekend of her death, both [the Defendant] and Mr. Cotten were under the belief [Christina] was to pick up [her son] and go to her parent's house in Chattanooga. Viewing the facts in [a] light most favorable to the [Estate], it appears as if no one was aware [Christina] was suicidal or even struggling with suicidal thoughts at the time of her death.

> Thus, even though [Christina] had a history of mental illness, based on the undisputed facts, the Court finds [Christina] was in control of her life and willfully and deliberately chose to end her own life.

Based on that analysis, the trial court concluded that Christina's "suicide was an intervening cause, which broke the chain of liability." The trial court's conclusions regarding duty and proximate cause rendered moot any issues related to comparative fault. The Estate filed a timely appeal.

The Court of Appeals reversed. *In re Estate of Cotten*, No. M2016-02401-COA-R3-CV, 2017 WL 4083645 (Tenn. Ct. App. Sept. 15, 2017), *perm app. granted* (Tenn. Jan. 18, 2018) (hereinafter "*Cotten*"). It first noted that "the issue of whether a legal duty is owed is largely dependent upon whether the risk was foreseeable and significant." *Id.* at *7 (citing *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 366-67 (Tenn. 2008); and *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502-03 (Fla. 1992)). Contrary to the trial court, however, the appellate court held that the undisputed facts were sufficient to support a finding that Christina's suicide was a foreseeable consequence of the Defendant's actions. The Court of Appeals reasoned:

> Based on Decedent's history of depression and previous suicide attempt, coupled with the loss of custodial rights concerning her son and the termination of her relationship with [the Defendant], it was reasonably foreseeable that Decedent might inflict harm upon herself by utilizing the

- 11 -

deadly weapon of which [the Defendant] made her aware. [The Defendant's] act of showing the firearm to Decedent and then returning it to an unsecured location within the home created an unreasonable risk of harm to the Decedent. We further conclude that the degree of foreseeability of the risk and the gravity of the harm outweighed the burden that would be imposed if [the Defendant] had engaged in an alternative course of conduct that would have prevented the harm.

*Id.* at *9. The intermediate appellate court held the allegations that the Defendant "display[ed] his firearm to [Christina] and plac[ed] it in a location that was known and accessible to [Christina]" described an act of misfeasance, rather than nonfeasance. *Id.* at *10. If it was misfeasance, the intermediate appellate court held, it was not necessary to find a special relationship in order to conclude that a duty existed. Regarding the allegations based on the Defendant's failure to act (nonfeasance), however, the appellate court upheld the grant of summary judgment on those claims because there was no special relationship between the Defendant and Christina. *Id.*

The Court of Appeals also reversed the trial court's holding on proximate cause. *Id.* at *11-12. The appellate court acknowledged the general rule that suicide and other self-inflicted injury generally qualify as a superseding intervening cause of the plaintiff's injury, and it also acknowledged that courts have recognized certain categorical exceptions to the rule. *Id.* at *11. It stated, however, that "applicability of the independent, intervening cause doctrine hinges on foreseeability, rather than whether the situation fits a particular exception." *Id.* at *12 (citing *Ramsey v. Cocke Cnty.*, No. E2016-02145-COA-R3-CV, 2017 WL 2713213, at *6 (Tenn. Ct. App. June 23, 2017)). The appellate court held that, regardless of whether a case fits an exception to the general rule, "liability could exist when a defendant knew or should have known that the decedent presented a reasonably foreseeable risk of suicide, as demonstrated by evidence indicating that the decedent's demeanor or actions should have raised concerns about her mental stability and that the defendant's actions increased such risk." *Id.* In this case, the court held, "reasonable minds could draw more than one conclusion regarding causation," so there was a fact issue that precluded summary judgment for the Defendant. *Id.* The Court of Appeals did not address whether the Defendant's liability could be reduced by the comparative fault of Christina.[16] We granted the Defendant's application for permission to appeal to this Court.

---

[16] In this appeal, the Defendant acknowledges that neither the trial court nor the Court of Appeals addressed the issue of comparative fault. He concedes that, under current law, a "defendant's liability may not be reduced by comparing his negligent conduct with the decedent's intentional act of committing

The Defendant argues that we should affirm the trial court's grant of summary judgment. He claims that the undisputed material facts demonstrate that he had no duty to Christina because, on the weekend of November 9, 2014, it was not reasonably foreseeable that she would commit suicide or use his gun to do so. The Defendant also argues that he did not have a special relationship with Christina, so he had no affirmative duty to protect her and cannot be held liable for nonfeasance. The Defendant maintains that he is entitled to summary judgment on proximate cause because Christina's suicide was the superseding intervening cause of her death.

In response, the Estate argues that, as a matter of law, the Defendant had a duty to Christina because her suicide was a foreseeable consequence of the totality of his negligent actions. The Estate contends that the undisputed evidence is sufficient to create a jury question on whether the Defendant's negligent conduct was the proximate cause of Christina's suicide or whether, instead, Christina's deliberate act of suicide was a superseding intervening cause.

In this appeal, we review the trial court's grant of summary judgment. A trial court's ruling on a motion for summary judgment presents a question of law; we review it de novo without a presumption of correctness in the trial court's decision. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "[T]he evidence must be viewed in a light most favorable to the claims of the nonmoving party, with all reasonable inferences drawn in favor of those claims." *Rye*, 477 S.W.3d at 286. In this appeal, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* at 250 (citing *In re Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013)). The moving party may satisfy its burden of production "(1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving

---

suicide [if] the intentional act was a foreseeable risk created by the defendant's negligence." *White*, 975 S.W.2d at 531. Nevertheless, the Defendant argues in his appellate brief that we should exercise our discretion to address the issue and to overrule *White*'s ruling on comparative fault in suicide cases. Given our holding in this opinion, it is unnecessary for us to reach either of those issues.

party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Id.* at 264.

## ANALYSIS

To establish a prima facie claim of negligence, the plaintiff must prove the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). In this case, the trial court granted summary judgment based on its conclusion that the Defendant had negated the elements of both duty and legal (proximate) cause. In our view, the pivotal issue is legal cause, specifically, whether Christina's suicide constitutes a superseding intervening event that cuts off any liability the Defendant may have for Christina's death. Consequently, we focus our analysis on the element of proximate or legal cause. *See Shipley v. Williams*, 350 S.W.3d 527, 567 (Tenn. 2011) ("[I]n seeking summary judgment, it is enough for a party to negate one element of a claim; it is not necessary that every element be negated.") (quoting *Jacobs v. Nashville Ear, Nose & Throat Clinic*, 338 S.W.3d 466, 477 (Tenn. Ct. App. 2010)).

### *Legal Cause and Superseding Intervening Events*

A plaintiff in a wrongful death negligence action must prove that the defendant's conduct was both the cause-in-fact and the legal cause of the decedent's death. *King v. Andersen Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013) (citations omitted). Cause-in-fact, sometimes called actual cause, means "the injury or harm would not have occurred 'but for'" the defendant's negligent conduct." *Id.* (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). "The concept of 'legal cause' was formerly known as 'proximate cause.' It connotes a policy decision made by the judiciary to establish a boundary of legal liability and to deny liability for conduct that could otherwise be actionable."[17] *Rains*, 124 S.W.3d at 592 (citations omitted). "An actor's negligent conduct is the legal cause of harm to another if the conduct is a substantial factor in bringing about the harm and there is no rule of law relieving the actor from liability because of the manner in which the actor's negligence resulted in the harm." *Id.* "[D]isputed issues regarding legal cause, intervening cause, and foreseeability must be

---

[17] The terms "legal cause" and "proximate cause" are synonymous, and we use them interchangeably for purposes of discussion.

left to the jury" unless "the undisputed facts and inferences to be drawn from the facts enable reasonable persons to draw only one conclusion." *Id.* at 596.

We determine whether the defendant's negligence was the legal or proximate cause of the plaintiff's death by using a three-part test:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991), *quoted in Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994), *and cited with approval in McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 905 (Tenn. 1996). The third part of the test, foreseeability, plays an important role in determining whether the defendant's conduct was the legal cause of the injury or death. While a person who owes a duty to another is expected to be vigilant, he is not expected to be prescient:

> The critical factor in distinguishing between vigilance and prescience is foreseeability, the third element in the proximate cause analysis. . . . Foreseeability is the crucial factor in the proximate cause test because, if the injury that gives rise to a negligence case could not have been reasonably foreseen, there is no proximate cause and thus no liability despite the existence of negligent conduct. "A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." However, "[t]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility."

*King*, 419 S.W.3d at 248 (citations omitted).

At times, an intervening event may interrupt the chain of proximate causation between the defendant's negligence and the victim's injury. "The most recent Restatement of Torts describes intervening or superseding cause as a subset of proximate cause." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 298 (Tenn. 2017) (citing Restatement (Third) of Torts § 34 (2010 & June 2017 update)). An "independent,

- 15 -

intervening cause" of the ultimate injury may "relieve a negligent actor from liability." *Rains*, 124 S.W.3d at 593-94. "The intervening cause doctrine is a common-law liability shifting device. It provides that a negligent actor will be relieved from liability when a new, independent[,] and unforseen [sic] cause intervenes to produce a result that could not have been foreseen." *Waste Mgmt. Inc. of Tenn. v. S. Cent. Bell Telephone Co.*, 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997); *see also Borne*, 532 S.W.3d at 296 n.9.

The terms "intervening" and "superseding" are not interchangeable. *See Howell ex rel. Williams v. Turner*, No. M2008-01588-COA-R3-CV, 2009 WL 1422982, at *3 n.5 (Tenn. Ct. App. May 21, 2009). Traditional terminology used in the First and Second Restatement of Torts referred to "intervening acts" and "superseding causes." Restatement (Third) of Torts: Phys. & Emot. Harm § 34 cmt. b (2010). Any event, whether it be an outside force or an act by a third party, that is a factual cause of the injury and occurs after the defendant's allegedly tortious conduct is an "intervening" force or act. *Id*. However, not every intervening force or act is superseding. "A 'superseding cause' is an intervening force or act that is deemed sufficient to *prevent* liability for an actor whose tortious conduct was a factual cause of harm." *Id*. (emphasis added). The Restatement (Third) of Torts explains that "[a] reasoning and normative process is required in order to . . . decide which intervening forces under what circumstances are superseding, thus avoiding the liability of an actor who engaged in tortious conduct." *Id*.

A defendant who asserts superseding cause as a defense must establish four elements:

> (1) the harmful effects of the superseding cause must have occurred after the original negligence; (2) the superseding cause must not have been brought about by the original negligence; (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence; and (4) the superseding cause must not have been reasonably foreseen by the original negligent party.

*Borne*, 532 S.W.3d at 299 (quoting *White v. Premier Med. Grp.*, 254 S.W.3d 411, 417 (Tenn. Ct. App. 2007)). Thus, the fourth element requires a defendant to establish that the alleged superseding event was not reasonably foreseeable by the original negligent party. For this reason, an intervening event that is a normal response created by the defendant's negligence will not qualify as "a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct [of the original wrongdoer] was a substantial

- 16 -

factor in bringing about the harm." *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998) (quoting *McClenahan*, 806 S.W.2d at 775).

*The Suicide Rule*

"Courts have long been rather reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act." *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990). In cases in which the intervening event is the decedent's suicide, courts in Tennessee and elsewhere have generally held that suicide will be deemed a superseding cause of death if it was "a willful, calculated, and deliberate act of one who has the power of choice." *White*, 975 S.W.2d at 530; *Lancaster v. Montesi*, 390 S.W.2d 217, 221 (Tenn. 1965); *see also MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 737-38 (6th Cir. 2007) (viewing Tennessee's suicide rule as "parsimonious" but firmly established); *Rains*, 124 S.W.3d at 593 ("Tennessee's courts, like other state and federal courts, have consistently recognized that the independent intervening cause doctrine may properly be invoked in cases involving self-inflicted injury or death." (footnote omitted)). "This is often referred to as the 'suicide rule.'"[18] Nicholas LaPalmea, *Michelle Carter and the Curious Case of Causation: How to Respond to a Newly Emerging Class of Suicide-Related Proceedings*, 98 B.U. L. Rev. 1443, 1451 n.64 (2018) (quoting 1 Modern Tort Law: Liability and Litigation § 4:9 (2d ed. June 2018 update)).

---

[18] A number of jurisdictions have adopted the suicide rule. *See, e.g.*, *City of Richmond Hill v. Maia*, 800 S.E.2d 573, 577 (Ga. 2017) ("[I]t has long been the rule in Georgia that, generally speaking, suicide is deemed an unforeseeable intervening cause of death which absolves the tortfeasor of liability."); *Chalhoub v. Dixon*, 788 N.E.2d 164, 168 (Ill. Ct. App. 2003) ("It is well-established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee."); *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 521 ("Indiana decisions hold that suicide constitutes an intervening cause, as a matter of law, if committed by one who is sane enough to realize the effect of his actions."); *McLaughlin v. Sullivan*, 461 A.2d 123, 124 (N.H. 1983) ("As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm."); *Lenoci v. Leonard*, 21 A.3d 694, 699 (Vt. 2011) ("Generally speaking, voluntary suicide is viewed as an independent intervening act that breaks the causal chain and severs potential liability."); *see also Carney v. Tranfaglia*, 785 N.E.2d 421, 425 (Mass. Ct. App. 2003) ("For the proposition that suicide may be viewed as an independent intervening cause between an anterior act of negligence and death there is authority."); *see generally* C. T. Drechsler, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 § 4[a] (originally published in 1950) (referring to the suicide rule as a "practically unanimous rule" and citing cases).

The suicide rule is based on the notion that suicide committed by a person who has the power of choice "is an abnormal thing" and that no reasonable person could foresee that a rational person would intentionally choose to commit suicide. *Lancaster*, 390 S.W.2d at 222 (quoting William L. Prosser, Handbook of the Law of Torts § 49, at 273-74 (2d. ed. 1955)). To determine whether suicide in a given case constituted a superseding intervening event, early cases on the suicide rule focused on the extent to which the decedent had the ability to reason and/or exercise the power of choice at the time of the suicide. *Id.*; *Jones v. Stewart*, 191 S.W.2d 439, 440-41 (Tenn. 1946).

For example, in *Jones v. Stewart*, the father of an eighteen-year-old "of good standing and reputation" falsely accused his son of breaking into his house and stealing his money. 191 S.W.2d at 439. The son was so distressed by the false accusation that he hung himself. *Id.* The estate of the son sued the father, asserting that the father's negligent accusations caused the son to commit suicide. *Id.* The Tennessee Supreme Court sustained the trial court's judgment for the defendant father based on a finding that the boy's intentional act of suicide, and not the defendant's negligence, was the proximate cause of the boy's death. *Id.* at 440-41. In support of this conclusion, the Court cited passages from cases in other jurisdictions:

> [W]e concede that a course of either mental or physical torture, or of both combined, may cause a death. And we also concede that the same course or courses of torture may produce a frame of mind that desires death as a means of relief. It is conceivable, therefore, that a tortured man may kill himself. *But, if he so kills himself deliberately, we hold that there is an intervening act of his own will for which the New York act affords no remedy.* If, on the other hand, it is contended that his self-killing is not his own act, but is the result of suicidal mania, we hold that suicidal mania is not a natural or reasonable result of either mental or physical torture.

*Id.* at 440 (emphasis added) (quoting *Salsedo v. Palmer*, 278 F. 92, 99 (2d Cir. 1921)). *Jones* also quoted with approval a Massachusetts case: "An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." *Id.* (quoting *Daniels v. New York, N.H. & H.R. Co.*, 67 N.E. 424, 426 (Mass. 1903)). The Court in *Jones* commented that the principles articulated in the Massachusetts case were consistent with Tennessee jurisprudence on proximate cause. It reasoned that the boy's suicide was not foreseeable because "[n]o reasonable person would have expected this young man to commit such a tragic and unnatural act

because he was falsely charged with a crime. It was contrary to human experience and the result of a deliberate independent act of the deceased . . . ." *Id.* at 440-41.

In 1965, the Tennessee Supreme Court applied the reasoning in *Jones* to facts that involve what is now easily recognizable as domestic violence. In *Lancaster v. Montesi*, the decedent's estate sued the decedent's paramour, asserting he should be held liable for negligently and willfully causing the decedent's suicide. 390 S.W.2d 217, 219 (Tenn. 1965). The complaint asserted that, for a considerable time, the defendant had placed the decedent under his "domination and control" by subjecting her to "punishment of the most sadistic type," with the result that the decedent "lost all ability to resist his domination." *Id.* Among other acts, the defendant had broken the decedent's leg, burned her with a cigarette, blacked her eyes, kicked her, and caused her to be bruised "over large areas." *Id.* More than once, the decedent had escaped, only to have the defendant forcibly retrieve her and bring her back to their apartment. *Id.* The day before her suicide, the decedent attempted suicide by leaping from the moving car in which she and the defendant were traveling. *Id.* The defendant again retrieved the decedent and brought her to their apartment, where she called a mutual friend, related her abuse, and said she planned to "end it all." *Id.* The friend then spoke to the defendant and asked him to take the decedent to a hospital and not leave her alone. The defendant responded, "Hell, I'm gone," and left the apartment. *Id.* Unsurprisingly, the decedent then committed suicide by jumping off of a bridge, leaving a suicide note that said: "Ma Ma, I'm sorry. [The defendant] has beat me enough." *Id.*

Taking the reasoning in *Jones* to an extreme, the Court in *Lancaster* held that, because the decedent was lucid when she took her own life, the decedent's act of suicide, not the defendant's conduct, was the proximate cause of her death:

> In an action for wrongful death, where the intervening cause relied on takes the form of suicide, then the cases both in this jurisdiction and elsewhere have generally held there to be no liability. It is only when the deceased was insane or in a frenzy at the time of death, as a result of the negligence, that some courts have been willing to hold that the proximate cause of the death was the defendant's wrongful act.

> Dean Prosser, in his discussion of Intervening Causes, sec. 49 of Prosser on Torts (1955), has this to say pertinent to our consideration of the problem:

>> 'Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to

the contrary, it seems the better view that when his insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable.  The situation is the same as if he should hurt himself during unconsciousness or delirium brought on by the injury.  But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supersedes the defendant's liability.'

*Id.* at 221-22 (first citing Annotation, 11 A.L.R.2d 751; and then quoting Prosser, supra, at § 49, at 273-74).  Reaching a result that would not likely obtain today, the Court in *Lancaster* applied the *Jones* reasoning to intentional or reckless conduct by the defendant and held that the decedent's intentional, deliberate act of suicide absolved the defendant of liability because it is not ordinarily foreseeable that one who is lucid and not "bereft of reason" would commit suicide.[19]  *Id.* at 222; *see also Weathers v. Pilkington*, 754 S.W.2d 75, 79 (Tenn. Ct. App. 1988) (holding in a medical malpractice action that decedent's suicide was a superseding cause because decedent was "functioning normally" in the weeks before his suicide); *Eckerd's v. McGhee*, 86 S.W.2d 570, 575 (Tenn. Ct. App. 1935) (holding suicide was a superseding cause unless decedent's "reason and memory were, at the time, so far obscured that she did not know and understand what she was doing, and was, therefore, not a responsible human agency").

---

[19] It is difficult to imagine that the facts in *Lancaster* would yield the same result today, particularly given the intentional nature of the defendant's conduct in that case and the evidence that the decedent was overtly suicidal.  Some courts have held that, "in the context of willful torts, 'the doctrine of superseding cause is inapplicable' and is 'discarded in favor of a cause-in-fact test.'"  Nicholas LaPalme, *Michelle Carter and the Curious Case of Causation: How to Respond to A Newly Emerging Class of Suicide-Related Proceedings*, 98 B.U. L. Rev. 1443, 1452 n.64 ((quoting *Kimberlin v. DeLong*, 637 N.E.2d 121, 127-28 (Ind. 1994), cert. denied, 516 U.S. 829 (1995) ("We hold that an action may be maintained for death or injury from a suicide or suicide attempt where a defendant's willful tortious conduct was intended to cause a victim physical harm and where the intentional tort is a substantial factor in bringing about the suicide.")); *see also* Intervening Cause; Superseding Cause, 1 Modern Tort Law: Liability and Litigation § 4:9 (2d ed.) ("[C]ourts in some jurisdictions . . . have declined to allow the doctrine of foreseeability to limit an intentional tortfeasor's liability in a wrongful death case involving suicide.").  The complaint in the instant case alleges only negligent conduct by the Defendant, and does not allege intentional misconduct, so this issue is not presented here.

*Exceptions to the Suicide Rule*

Perhaps unsurprisingly, the harsh results in cases such as *Lancaster* led later courts to adopt exceptions to the suicide rule. They recognized that suicide is not intrinsically a superseding intervening event that will *always* cut off the liability of the defendant, even if the decedent had some ability to reason and exercise the power of choice at the time of the suicide. Because the focus is on whether suicide was a reasonably foreseeable probability, the more common exceptions involve fact patterns in which it is more likely that the defendant should have foreseen the decedent's suicide. *See Rains*, 124 S.W.3d at 593-94.

The first of the common exceptions to the suicide rule arises where it is reasonably foreseeable that the defendant's conduct will cause a mental condition in the decedent that would lead to the self-destructive act. *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 442 (7th Cir. 2009) ("[The suicide] rule carries an exception that deems suicide foreseeable when the defendant's conduct caused an injury, most often to the head, that made the decedent so 'bereft of reason' as to cause him to attempt suicide." (internal quotation marks omitted) (quoting *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911 (Ill. App. Ct. 2007)); *Patton v. Bickford*, 529 S.W.3d 717, 732 (Ky. 2016) (noting suicide is not a superseding event when defendant's conduct "foreseeably induces a suicidal reaction" (quoting 25A C.J.S. *Death* § 68 (2017))); *McLaughlin v. Sullivan*, 461 A.2d 123, 124 (N.H. 1983) ("The first exception involves cases where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act."). In other words, if the mental condition that led the decedent to commit suicide was the natural and probable result of the defendant's conduct, the suicide may not be a superseding cause of the decedent's death. *See Rains*, 124 S.W.3d at 594; *see also Scheffer v. Washington City, V.M. & G.S.R. Co.*, 105 U.S. 249, 252 (1881) (finding that decedent's suicide was a superseding cause of his death because his "insanity" was not the "natural or probable result of the negligence of the railway officials"); *Potts v. First Peoples Bank of Jefferson Cnty.*, No. 03A01-9303-CV-00116, 1993 WL 276858, at *3-4 (Tenn. Ct. App. July 22, 1993) (holding suicide was a superseding cause where it was "contrary to human experience" to expect that decedent would have committed suicide in response to bank's aggressive collection tactics (quoting *Jones*, 191 S.W.2d at 441)).

Other exceptions to the suicide rule have been recognized in some commonly-occurring fact patterns where the suicide was reasonably foreseeable and the defendant

- 21 -

was in a position to prevent it. For example, modern cases recognize that suicide, even by one who retains the ability to reason, is not a superseding cause when it occurs in a custodial context and "the intervening act [of suicide] is itself the foreseeable harm that shapes a defendant's duty." *Kane v. State*, No. 89-75-II, 1989 WL 136963, at *2 (Tenn. Ct. App. Nov. 15, 1989) ("Reasonably foreseeable acts or acts that are the natural consequence of the original negligent act cannot be independent, intervening acts."). In *Cockrum v. State*, for example, the husband of a female inmate sued the State, claiming that his wife's suicide resulted from negligent supervision. 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992). Relying on the general suicide rule, the State argued that the inmate's act of suicide was the superseding cause of her death unless her husband proved that his wife was "in a frenzy" when she committed suicide. *Id.* The Court of Appeals disagreed; it concluded that the duty of prison officials could extend to preventing inmate self-injury "when the prison officials know or should know that the prisoner might harm himself or herself." *Id.*; *see also Kane*, 1989 WL 136963, at *3 ("[I]n a correctional context, acts of suicide should not always be treated as independent, intervening acts . . . .").

Another fact pattern commonly recognized as an exception to the suicide rule is where the defendant had a "special relationship," often of a medical nature, with the decedent. As with the custodial exception, even where the decedent had the ability to exercise the power of choice at the time of the act, suicide may not be a superseding cause if it occurs in the context of a "special relationship" and the suicide was reasonably foreseeable.

Just such a medical relationship was involved in *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998). In that case, the plaintiff's decedent was an alcoholic who was severely depressed, and the defendant was his treating physician. *White*, 975 S.W.2d at 527. The decedent's excessive alcohol consumption had caused him serious physical problems, so the defendant physician prescribed Disulfiram, also known as "Antabuse." *Id.* Antabuse causes a physical sensitivity to alcohol such that, if a person drinks even a small amount of alcohol while taking the medication, the result will be highly unpleasant physical reactions. *Id.* at 527 & n.1. However, instead of giving the prescription to the decedent, the defendant physician gave it to the decedent's wife. *Id.* at 527. He instructed the decedent's wife to grind up the Antabuse medication and secretly administer it to the decedent. She followed his instructions. *Id.* Soon afterward, the decedent became ill and went alone to the emergency room, complaining of hot flashes and pain. Because the decedent did not know he had ingested Antabuse, he could not give that information to emergency room personnel; they diagnosed him with heat exhaustion and discharged him that same day. *Id.* Four hours later, the decedent committed suicide by shooting himself in the head. *Id.* at 528.

The decedent's wife filed a wrongful death medical malpractice action against the defendant physician in *White*, asserting that his medical negligence caused the decedent's death. *Id.* The defendant moved for summary judgment based on the suicide rule; he argued that the decedent's decision to commit suicide was the superseding intervening cause of his death and barred any recovery. *Id.* The trial court denied the motion for summary judgment but granted permission for an interlocutory appeal. *Id.* After the Court of Appeals reversed, this Court granted permission to appeal. *Id.*

In *White*, the Court acknowledged cases holding "that suicide may constitute an intervening [superseding] cause if it is a willful, calculated, and deliberate act of one who has the power of choice." *Id.* at 530 (collecting cases). It also recognized, however, that "[a]n intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm." *Id.* at 529 (quoting *McClenahan*, 806 S.W.2d at 775). *White* focused its analysis on whether the decedent's suicide was foreseeable:

> As the expert testimony in this case demonstrates, the foreseeability or likelihood of a suicide does not necessarily depend upon the mental capacity of the deceased at the time the suicide was committed. *The fact that the deceased was not insane or bereft of reason does not necessarily lead to the conclusion that the suicide, which is the purported intervening cause, is unforeseeable.* As our cases dealing with proximate or legal causation have indicated, the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so, the suicide is not an independent intervening cause breaking the chain of legal causation.

*Id.* at 530 (emphasis added). Recognizing its departure from previous cases in which application of the suicide rule was based solely on the decedent's ability to reason and exercise the power of choice at the time of the suicide, the *White* Court held that "[t]hose decisions holding to the contrary are overruled." *Id.* The Court did not identify those "contrary" decisions.[20] Instead, it cited with approval cases in which the decedent was

---

[20] Unfortunately, the entirety of the holding in *White* was less than clear. While the facts involved a physician-patient relationship, the opinion did not mention the common "special relationship" exception to the suicide rule. In addition, the fact that the Court did not identify the "decisions holding to the

- 23 -

being treated by the defendant medical professional for mental health issues.[21]  *Id.* (citing *Champagne v. U.S.*, 513 N.W.2d 75, 81 (N.D. 1994) ("[W]hen a patient's suicide is a foreseeable consequence of the medical provider's negligent care, the act of suicide cannot be deemed a superseding intervening cause."); *Jacoves v. United Merchandising Corp.*, 11 Cal.Rptr.2d 468, 482-83 (Cal. Ct. App. 1992); *Summit Bank v. Panos*, 570 N.E.2d 960, 968-69 (Ind. Ct. App. 1991), *abrogated in part on other grounds by Vergara ex rel. Vergara v. Doan*, 593 N.E.2d 185 (Ind. 1992); *Cowan v. Doering*, 545 A.2d 159, 166-67 (N.J. 1988)).

A few years later, in an opinion authored by then-Judge William C. Koch, Jr., the Court of Appeals noted the more common exceptions to the suicide rule and expanded beyond them.  In *Rains v. Bend of the River*, the defendant retailer sold ammunition to the decedent, an eighteen-year-old under the legal age (twenty-one) for purchasing ammunition.  *Rains*, 124 S.W.3d at 585-86 (citing 18 U.S.C. § 922(b)(1) (2000)).  Before purchasing the ammunition, the decedent had taken a handgun out of his parents' locked gun case; after the purchase, he loaded the handgun with the ammunition he had bought, drove his car to a remote location, and fatally shot himself.  *Id.* at 585.  The appellate court noted that, "[f]rom all outward signs, [the decedent] was a happy, well-adjusted young man," and the suicide note left in the decedent's wallet shed no light on his reason for taking his own life.  *Id.* at 586.

The decedent's parents in *Rains* filed a wrongful death action against the retailer, asserting that the retailer's sale of ammunition to the underage decedent caused his death. *Id.*  The defendant retailer moved for summary judgment, arguing that the decedent's suicide was a superseding intervening event that relieved the retailer of liability.  *Id.*

---

contrary" it overruled further muddied its holding.  Nevertheless, *White*'s focus on whether the suicide was a foreseeable result of the defendant physician's negligent conduct is consistent with our analysis herein.

[21] For Tennessee cases consistent with *White*, *see Drake v. Williams*, No. M2007-00979-COA-R3-CV, 2008 WL 1850872, at *15 (Tenn. Ct. App. Apr. 25, 2008) (denying summary judgment on superseding cause where defendant psychiatrist allegedly discharged plaintiff's decedent from her care prematurely, allegedly causing decedent to commit suicide); *Rural Educ. Ass'n v. Anderson*, 261 S.W.2d 151, 154 (Tenn. Ct. App. 1953) (denying summary judgment for defendant hospital where plaintiff's decedent was "irrational" and "confused" when he jumped out of hospital window); and *Spivey v. St. Thomas Hosp.*, 211 S.W.2d 450, 457 (Tenn. Ct. App. 1947) (finding negligence of defendant hospital caused suicide of plaintiff's decedent where decedent was delirious upon arrival at hospital and subsequently jumped out of window).

The appellate court first noted the three common exceptions to the suicide rule described above. *Id.* at 593-94. The court then went beyond them to discuss a fourth, situations in which the defendant facilitated the suicide by supplying the decedent with the means to carry it out: "In cases brought against persons who supplied a suicide victim the means to commit suicide, the foreseeability question hinges on the victim's behavior and demeanor at the time of the sale. Abnormal behavior can provide a basis for concluding that the supplier knew or should have known that the decedent was suicidal." *Id.* at 594. However, "[w]hen the purchaser's conduct and demeanor would not have put the seller on notice that he or she was mentally unstable, the courts hold, as a matter of law, that the purchaser's suicide is an independent, intervening cause that shields the seller from liability for the suicide." *Id.* The appellate court explained: "Suicide, because of its inherently self-destructive nature, is not the sort of misuse or mishandling that sellers of ammunition should be required to foresee in the absence of conduct providing the seller with reason to believe that the purchaser might be suicidal." *Id.* at 594-95.

From the undisputed facts in the record, the appellate court in *Rains* found no basis for the trier of fact to conclude that the decedent's suicide was the foreseeable result of the defendant's conduct. *Id.* at 595. It found no evidence showing that the defendant ammunition seller "knew or should have known that [the decedent] intended to use the ammunition he purchased . . . to commit suicide." *Id.* at 596. Consequently, the appellate court held that the decedent's suicide was "an independent, intervening cause" that insulated the defendant from liability. *Id.*

In a recent case, the Court of Appeals again addressed whether the suicide rule should preclude liability if the facts did not fit neatly into one of the common exceptions. In *Ramsey v. Cocke County*, the plaintiff mother sued the defendant municipalities, claiming that their negligent refusal to respond to her 9-1-1 call caused her daughter's death by suicide. No. E2016-02145-COA-R3-CV, 2017 WL 2713213, at *1 (Tenn. Ct. App. June 23, 2017), *perm. app. denied* (Tenn. Nov. 17, 2017). When the plaintiff mother called for emergency assistance, she reported to the 9-1-1 dispatcher that her daughter's mental and behavioral status was declining and that she had threatened to commit suicide. *Id.* The defendants allegedly refused to respond because it "was not their policy to respond to domestic family issues." *Id.* Repeated calls yielded the same result; the mother finally drove to the police department to plead in person for help, only to find it closed. *Id.* When the mother returned home, her daughter had killed herself. *Id.* at *2.

The defendant municipalities in *Ramsey* moved for summary judgment. *Id.* They argued that the suicide rule precluded their liability unless one of the three common

exceptions identified in *Rains* applied. *Id.* at *6. The trial court agreed and granted summary judgment in favor of the defendants. *Id.* at *3.

The intermediate appellate court in *Ramsey* reversed the trial court's grant of summary judgment. *Id.* at *8. It first observed that the facts in the Court of Appeals' previous decision in *Rains* also did not fit into any of the three common exceptions listed in that case. *Id.* at *6 n.5.[22] It explained that the suicide rule should not be applied mechanically and characterized the pivotal question as whether the decedent's suicide was reasonably foreseeable, not whether the facts fit one of the exceptions enumerated in *Rains*. *Id.* at *6. Viewing the facts in a light most favorable to the plaintiff, the appellate court held that "a factfinder could reasonably conclude that it is foreseeable that [the daughter] would follow through with her threats to commit suicide." *Id.* For this reason, it reversed the trial court's application of the suicide rule and denied the defendant's motion for summary judgment. *Id.* at *8. This Court denied permission to appeal. *Ramsey v. Cocke Cnty.*, No. E2016-02145-SC-R11-CV (Tenn. Nov. 17, 2017).

Thus, Tennessee's application of the suicide rule has evolved over time. Early cases such as *Lancaster* applied the suicide rule virtually as a matter of law, based on the decedent's ability to exercise the power of choice. In *White*, the Court expressly rejected this view and instead adopted a more modern focus on whether the decedent's suicide was a reasonably foreseeable probability. *See* 975 S.W.2d at 530. Although Tennessee courts have recognized the usefulness of the more common exceptions to the suicide rule, they have clearly not been bound by them. Reflecting the more modern view, cases such as *Ramsey* properly demonstrate that suicide may not be deemed a superseding cause even when the facts do not neatly fit into one of the common exceptions, provided the decedent's suicide was a reasonably foreseeable probability naturally resulting from the defendant's conduct. *See Ramsey*, 2017 WL 2713213, at *6 (recognizing common exceptions inapplicable but nevertheless declining to apply the suicide rule because "a factfinder could reasonably conclude that it is foreseeable that [the decedent] would follow through with her threats to commit suicide"); *see also Rains*, 124 S.W.3d at 593-95 (recognizing three common exceptions to suicide rule but analyzing whether ammunition purchaser's suicide would have been reasonably foreseeable to defendant gun dealer); *Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 749 (M.D. Tenn. 2010) ("Because it is at least a question of fact whether [the decedent's] suicide is an independent

---

[22] The appellate court in *Ramsey* stated: "It appears that circumstances in which a person supplies the victim with the means to commit suicide constitute another exception to the rule that suicide is an independent intervening cause." 2017 WL 2713213, at *6 n.5.

intervening [superseding] cause, the court will not dismiss the plaintiff's claims for lack of proximate cause.").

Thus, to the extent that the Defendant in this case argues that his conduct cannot be deemed the legal cause of Christina's suicide unless the facts fit precisely into one of the common exceptions to the suicide rule, we reject that argument. *See Smith*, 688 F. Supp. 2d at 747 (viewing a contrary rule as being "too narrow" under Tennessee law (citing *Rains*, 124 S.W.3d at 593)). Regarding proximate or legal cause, we agree that "the touchstone is foreseeability, not whether a given case fits into a previously carved-out exception." *Ramsey*, 2017 WL 2713213, at *6 (quoting *Smith*, 688 F. Supp. 2d at 748); *see also Rains*, 124 S.W.3d at 593 ("Foreseeability is the key here because no person is expected to protect against harms from events that he or she cannot reasonably anticipate or foresee or which are so unlikely to occur that the risk, although recognizable, would commonly be disregarded."). As indicated by this Court in *White*, "the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so, the suicide is not an independent intervening cause breaking the chain of legal causation." 975 S.W.2d at 530.

Nevertheless, though application of the suicide rule has changed somewhat, the reasons for it remain relevant.[23] As noted in *Rains*, a negligent actor "has much less reason to anticipate intentional misconduct than negligence[,] . . . [and] injuries are even less foreseeable when they result 'from an act committed by the injured party so obviously fraught with peril as should be sufficient to deter one of reasonable intelligence.'" *Rains*, 124 S.W.3d at 593 (citations omitted) (quoting *Chattanooga Light & Power Co. v. Hodges*, 70 S.W. 616, 618 (Tenn. 1902)). For this reason, in cases where Tennessee courts have recognized an exception to the suicide rule, they have required solid evidence in the record that the decedent's suicide was a reasonably foreseeable probability resulting from the defendant's conduct.

We now apply these principles to the facts in this case.

---

[23] In advocating that we abolish the suicide rule altogether, neither the Estate nor the dissent points to any state that has so held. The dissent, in fact, cites a law review article acknowledging that the suicide rule "is now widely accepted among U.S. courts." Alex B. Long, *Abolishing the Suicide Rule*, 113 Nw. U. L. Rev. 767, 771, 784 (2019). We decline the Estate's invitation to abolish the suicide rule entirely.

*Application of Law to Facts*

To recap, the trial court granted summary judgment in favor of the Defendant, holding that the Defendant had negated the element of proximate cause. It found that the undisputed evidence showed that the Defendant had no reason to foresee that Christina's suicide would result from his conduct. It held that none of the common exceptions to the suicide rule were applicable and concluded that Christina's decision to commit suicide constituted a superseding intervening event that broke the chain of proximate causation.

The Court of Appeals reached the opposite result. Citing *Rains* and *Ramsey*, the appellate court emphasized that the independent, intervening cause doctrine "hinges on foreseeability, rather than whether the situation fits a particular exception." *Cotten*, 2017 WL 4083645, at *12. It recited the stressful events in Christina's life that occurred between January and November 2014. *Id.* at *8. It noted that, after those events, the Defendant showed Christina his gun, informed her that he wanted to pursue another relationship, and two weeks later allowed her to stay in his home by herself without removing or securing his gun. *Id.* According to the Court of Appeals, this evidence created a factual issue as to whether the Defendant should have foreseen that Christina was at risk for suicide or should have realized that his actions increased that risk, thereby justifying a departure from the suicide rule. *Id.* (citing *Rains*, 124 S.W.3d at 595). Accordingly, the Court of Appeals reversed the trial court's grant of summary judgment in favor of the Defendant.

At the outset of our analysis, we note that many of the Estate's arguments sidle up to the commonly recognized exceptions to the suicide rule, implying that each of them may be applicable to varying degrees. We agree with the trial court that none of the more common exceptions to the suicide rule are applicable under these facts.

For example, although the Estate repeatedly recites actions by the Defendant that upset Christina, this case does not fit the exception for "circumstances in which the defendant's negligence causes delirium or insanity that results in self-destructive acts." *Rains*, 124 S.W.3d at 593. The Estate emphasizes that the Defendant caused Christina distress by breaking off his relationship with her in August 2014, engaging in an off-and-on relationship for a period of time, and then in October 2014 telling Christina that he wanted to pursue a relationship with another woman. However, these facts do not support a finding that the Defendant negligently inflicted physical, mental, or emotional injury that resulted in the decedent becoming insane or having a suicidal impulse. *McLaughlin*, 461 A.2d at 124; *Patton*, 529 S.W.3d at 729. The Defendant, of course, had no obligation to continue his dating relationship with Christina in order to avoid causing

her distress, and the undisputed facts contain no indication of cruelty, torment, or anything other than an uneven, drawn-out unwinding of their relationship.

In addition, the relationship between the Defendant and Christina did not fit the exception for a custodial relationship. *See Rains*, 124 S.W.3d at 594. The Estate emphasizes that Dr. Brooks released Christina "to" the Defendant's care after Christina's January 2014 overdose, and it argues that the Defendant negligently contributed to Christina's suicidal mental state by failing to ensure that she received proper mental-health counseling after the overdose. Even assuming these facts to be true, it is undisputed that the Defendant's relationship with Christina never came close to being a "custodial" relationship, and the Defendant had no control over Christina or her interactions with her healthcare providers.[24] *See Cockrum*, 843 S.W.2d at 436-37.

The relationship between the Defendant and Christina likewise did not fit the exception for a medical "special" relationship.[25] Although the Estate emphasizes that the Defendant is a psychiatrist, it is undisputed that he was never Christina's treating physician, only her "boyfriend," so they did not have a "medical provider/patient" type of special relationship.[26] *White*, 975 S.W.2d at 531.

---

[24] Regardless of whether the Defendant "assured" Dr. Brooks that Christina's treating psychiatrist would be informed of the overdose, the Defendant was not married to or related to Christina, and Christina retained full control over her interactions with her treating physicians and the information they were given. The Defendant had no authority to do anything more than urge Christina to give full information to her healthcare providers.

[25] In its appellate brief, the Estate also asks this Court to hold that the Defendant and Christina had a "special relationship" based on "the totality of the circumstances." We decline to do so. We have found no cases where a close friendship or boyfriend/girlfriend scenario has been deemed to be "special relationship" in the context of the suicide rule. *See Webstad v. Stortini*, 924 P.2d 940, 948-949 (Wash. Ct. App. 1996) (discussing different types of relationships in suicide context as it relates to duty to protect).

[26] Both the Estate and the dissent emphasize the fact that the Defendant is a psychiatrist and cite Dr. Asta's testimony that "a responsible psychiatrist should have called to let Dr. Asta know that one of his patients had been hospitalized," implying that the Defendant had a duty *as a psychiatrist* to inform Dr. Asta about Christina's suicide attempt. However, the Defendant was not Christina's "psychiatrist," he was a friend; he had no professional duties as to Christina. Nothing in the record explains why Dr. Brooks, as Christina's treating physician, failed to obtain Christina's express permission to inform Dr. Asta of her hospitalization and send Dr. Asta copies of the pertinent medical records, in the normal course.

Taking another tack, the Estate seeks to hold the Defendant liable for Christina's suicide by alleging that he negligently supplied a "feeble-minded" adult with a dangerous instrumentality, citing *Stanley v. Joslin*, 757 S.W.2d 328, 332 (Tenn. Ct. App. 1987). In *Stanley*, the defendant negligently allowed a minor to have access to her gun case; the minor retrieved a gun from the gun case and accidentally killed his friend with it. *Stanley*, 757 S.W.2d at 329-30. The Court of Appeals held that the facts presented a jury question as to whether the defendant was negligent in causing conditions that proximately caused the death of the minor. *Id.* at 333. In doing so, it cited with approval a Restatement section indicating that "it is negligent to place loaded firearms or poisons within reach of young children or feeble-minded adults." *Id.* at 332 (quoting *Kuhns v. Brugger*, 135 A.2d 395, 405 (Pa. 1957) (quoting Restatement (First) of Torts § 308 cmt. (b) (1934))). Similarly, the Estate argues, the Defendant in the instant case negligently showed a dangerous instrumentality to Christina and then later left her alone without securing it; in this way, he caused her suicide.

*Stanley* is unhelpful for more than one reason. First, the issue in *Stanley* was whether a person who allows a child access to a gun is negligent. *Id.* at 331. In contrast, in this appeal, we focus on whether an adult's intentional act of suicide is a superseding event that cuts off an alleged tortfeasor's liability. More importantly, to apply *Stanley* in any fashion would require this record to contain evidence that Christina was, in fact, "feeble-minded" or incompetent. *See, e.g.*, *Davis v. Cox*, 206 S.E.2d 655, 657 (Ga. Ct. App. 1974) (holding that evidence presented a jury question regarding foreseeability when defendant negligently left a loaded pistol in a senile person's bedroom drawer and they used it to commit suicide). While the record shows Christina had a history of emotional problems, there is no evidence that she was ever "feeble-minded" or incompetent. So, to the extent that there may be an exception to the suicide rule for one who supplies the means for suicide to a "feeble-minded" adult, the facts in this case would not fit such an exception.

Indeed, the Defendant in the instant case did not in fact "supply" the means for suicide in same sense as the defendant in *Rains*, in which the defendant retailer sold ammunition to the underage decedent. *Rains*, 124 S.W.3d at 585. The Defendant did not give Christina a gun or ammunition. At the time he showed Christina and her son the gun he had been given, he was in the process of disentangling from their romantic relationship, Christina was no longer living in the Defendant's home where the gun was stored, and he had no reason to anticipate that she would be moving back in.

Recognizing that these facts may not fit into one of the commonly recognized exceptions to the suicide rule, the Estate goes on to stress general foreseeability. *See*

*Smith*, 688 F. Supp. 2d at 748; *White*, 975 S.W.2d at 530; *Rains*, 124 S.W.3d at 593. It argues that we should decline to hold that suicide was a superseding cause because Christina's suicide was reasonably foreseeable to this particular Defendant. At the core of its allegations, the Estate claims that the Defendant was negligent by showing Christina his gun in October 2014, immediately telling her that he was interested in pursuing a relationship with another woman, and then allowing Christina to stay in his house two weeks later by herself without removing or securing the gun, all while knowing that Christina was in a fragile mental state. The totality of the circumstances, the Estate argues, creates a jury question regarding whether Christina's suicide was reasonably foreseeable to the Defendant.

As emphasized in our analysis above, we agree that the fact that this case does not fit neatly into one of the common exceptions to the suicide rule is not fatal to the Estate's claim. That, however, does not end the analysis. After reviewing the undisputed facts, we must agree with the trial court that there is no evidence to support a finding that Christina's suicide was reasonably foreseeable to the Defendant during the relevant time period.

As we have indicated, in determining whether the Defendant is entitled to summary judgment on the issue of proximate cause, we must view the facts in a light most favorable to the Estate, with all reasonable inferences drawn in its favor. *See Rye*, 477 S.W.3d at 286. However, for us to find there is an issue of material fact regarding proximate cause and foreseeability, the record must contain evidence showing that "the injury was a reasonably foreseeable probability, not just a remote possibility." *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 551 (Tenn. 2005) (quoting *Tedder v. Raskin*, 728 S.W.2d 343, 348 (Tenn. Ct. App. 1987)); *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992). Moreover, "[f]oreseeability must be determined as of the time of the acts or omissions claimed to be negligent." *King*, 419 S.W.3d at 248 (citing *Linder Constr. Co.*, 845 S.W.2d at 178); *see also Johnstone v. City of Albuquerque*, 145 P.3d 76, 81 (N.M. Ct. App. 2006) (relying on what the defendant knew at the time his firearm was available to the decedent). In determining whether suicide was reasonably foreseeable, it is important that courts not indulge in hindsight. Consequently, we focus on the facts that were available to the Defendant at the time he allowed Christina to stay at his house with his gun unsecured.

The undisputed facts show Christina attempted suicide in January 2014, shortly after her ex-husband filed for custody of their son. The record shows some variable depression in June 2014 due to the loss of custodial rights to her son. After that, there are no facts in the record indicating the Defendant should have seen Christina as having an

outsized, suicidal response to the various stressors in her life. The record contains no evidence indicating Christina remained depressed about custody issues, and throughout 2014 she exercised parenting time with her son without restriction. In August 2014, Christina was "upset" about the break-up with the Defendant and moving out of the Defendant's house, but she did not have an abnormal reaction to those developments. Nothing in the record indicates that Christina had a suicidal inclination at that point or that the Defendant should have detected one. By October 2014, when the Defendant acquired the gun and showed it to Christina, nearly nine months had passed since Christina's January 2014 suicide attempt. The Defendant and Christina were no longer living together in the same house, and the evidence supports only a finding that Christina had seemed to be in a sound frame of mind for several months. When the Defendant told Christina he wanted to see another woman in October 2014, Christina initially stormed out of the Defendant's house—again, not a disproportionate response to that information—and afterward the Defendant and Christina carried on amicably. No facts in the record indicate the interactions between the Defendant and Christina while Christina was staying at the Defendant's house following her eviction—about ten months after Christina's suicide attempt—should have tipped him off as to her suicidal frame of mind.[27]

Both the Estate and the dissent attempt to establish foreseeability by proffering testimony from Dr. Asta and from Dr. Brooks. Dr. Brooks testified that, when releasing a

---

[27] The dissent's analysis devotes much attention to the Defendant's proposed undisputed Fact No. 11, which states that "[t]he threat of losing more time with her son caused Ms. Cotten to become further emotionally distraught." As noted above in footnote 11, the Estate objected to this proposed undisputed fact and pointed out, correctly, that the deposition testimony on Christina's frame of mind cited in support of this assertion does not pertain to the October 2014 time period at all. Regardless, even assuming an inference that Christina was upset or "distraught" by her October 2014 conversation with Mr. Cotten about her parenting time does not change the analysis. The record contains no evidence or statement of fact indicating that the Defendant was told of Mr. Cotten's October 2014 conversation with Christina or that the Defendant was aware of Christina's emotional response to any such conversation. Moreover, nothing in the record indicates that the Defendant had knowledge of facts indicating that Christina was in distress disproportionate to the circumstances or that she was having suicidal ideations.

The dissent emphasizes that Christina "did not live to testify about what she told [the Defendant] and what went on between them during her last days or to dispute his self-serving testimony." Such an emotional appeal implicitly acknowledges the lack of actual evidence in this record. To prevail on summary judgment, the Estate must put forth evidence of facts, known to the Defendant when he agreed to let Christina stay in his house, indicating that her suicide "was a reasonably foreseeable probability, not just a remote possibility." *West*, 172 S.W.3d at 551 (quoting *Tedder*, 728 S.W.2d at 348). The Estate failed to do so.

patient who is a suicide risk, the patient should not be allowed in the home until all firearms are removed. Dr. Asta similarly testified that, when dealing with patients who are clinically depressed and anxious, there is always a concern about having guns in the house, and that persons who have depressive or anxiety symptoms are at a higher risk of suicide. He pointed out that guns are a particularly effective way of committing suicide, more lethal than pills or other means.

The testimony of Dr. Asta and the testimony of Dr. Brooks, taken together, are probative only of steps the Defendant allegedly should have taken *if he had reason to know* that Christina was depressed or suicidal in November 2014. They do not go to the central question, namely, whether the Defendant should have perceived that Christina's suicide was "a reasonably foreseeable probability, not just a remote possibility." *West*, 172 S.W.3d at 551; *Doe*, 845 S.W.2d at 178. Neither Dr. Brooks nor Dr. Asta point to "conduct and demeanor" by Christina that would have put the Defendant on notice that Christina was suicidal, either when he showed her his gun or when he allowed her to stay in his home without securing the gun. *Rains*, 124 S.W.3d at 594. Therefore, neither doctor's testimony creates a fact question for the jury on proximate cause.

The premise of the Estate's argument is that the Defendant's actions were committed while knowing that Christina was in a "fragile mental state." From our review, the only evidence that Christina was in a "fragile mental state" during the relevant time period comes from the benefit of hindsight, such as evidence of her secret involvement in prostitution and/or X-rated filmmaking and, of course, her ultimate act of suicide.[28] The only other proof regarding Christina's mental state after the January 2014 suicide attempt came from Dr. Asta, with whom Christina communicated three times in 2014—in June, August, and October. Although Christina never told Dr. Asta of the January 2014 suicide attempt, his records nevertheless suggest that while she was taking the medication he prescribed for her, she functioned without restriction. Dr. Asta testified that, in mid-October 2014, he specifically asked Christina if she was having suicidal ideations, and she said that she was not. Dr. Asta concluded that Christina was doing fine. He specifically concluded that she was not suicidal.

Indeed, despite the Estate's characterization of Christina as having been in a "fragile mental state" in October and November 2014, each person in Christina's life was

---

[28] The dissent implies that information about Christina's illicit activities is included in our opinion "only . . . to cast [Christina] in a bad light." We disagree. It indicates that, during the relevant time period, Christina chose not to reveal some salient facts about her life to the Defendant or anyone else close to her.

- 33 -

surprised at the news of her suicide. Mr. Cotten himself testified that, even when Christina did not return his calls about picking up their son on the weekend she committed suicide, he did not suspect that Christina had harmed herself. *See Rains*, 124 S.W.3d at 596 ("As tragic as Mr. Rains's death is, we have no basis for holding Bend of the River to a different standard of foreseeability than his family.").

"As a general matter, disputed issues regarding legal cause, intervening cause, and foreseeability must be left to the jury. However, the courts must and should resolve these issues when the undisputed facts and inferences to be drawn from the facts enable reasonable persons to draw only one conclusion." *Id*. (citing *White*, 975 S.W.2d at 529-30). Stated differently, the issue of proximate cause should be withheld from the jury only if there is no dispute about the essential facts and only one conclusion may reasonably be drawn from the evidence. However, even for a defendant who is aware of a decedent's past suicide attempt and mental health issues, there must be facts in the record that would have put the defendant on notice that suicide was a reasonably foreseeable probability *at the time of the allegedly negligent acts*.[29] In the absence of such facts, the suicide must be deemed a superseding intervening event and the defendant, even if negligent, cannot be held liable. *See, e.g.*, *Chalhoub v. Dixon*, 788 N.E.2d 164, (Ill. Ct. App. 2003) (finding no evidence defendant stepfather should have foreseen his stepson's use of his gun to commit suicide, even though son had threatened suicide a few days earlier); *Johnstone v. City of Albuquerque*, 145 P.3d 76, 85 (N.M. Ct. App. 2006) (finding no evidence defendant off-duty police officer should have suspected

---

[29] The dissent cites *Delaney v Reynolds* as an example of a similar case in which the facts were found sufficient for the jury to decide whether the actions of the defendant boyfriend were the proximate cause of his girlfriend's self-inflicted injuries. 825 N.E.2d 554, 558 (Mass. Ct. App. 2005). The facts in *Delaney*, however, stand in stark contrast to the undisputed facts in this case. In *Delaney*, the plaintiff girlfriend, who lived with the defendant, survived her self-inflicted gunshot wound. *Id.* at 555. She claimed that the defendant boyfriend knew she had previously attempted to kill herself by automobile exhaust inhalation, and that he also knew *at the time of her self-inflicted injury* that she was actively considering suicide. *Id.* The girlfriend further claimed that, in the month leading up to the incident, she told the defendant boyfriend "that she had 'had enough of this and [she] wanted to end [her] life." *Id.* The boyfriend's "response was to hand [his girlfriend] his gun and instruct her to go outside so as not to make a mess in his house." *Id.* at 555-56. Although the girlfriend took the gun outside, she did not shoot herself. *Id.* at 556. Later *that same month*, the girlfriend again told the defendant boyfriend "that she hated her life and wanted to die." *Id.* In contrast, in the instant case, although Christina had a history of depression and other mental health issues, there is no indication that the Defendant was aware of facts during the relevant time frame indicating that Christina was actively contemplating suicide, and Christina was no longer living in the Defendant's home when she was shown the gun. Thus, the facts in *Delaney* are not comparable to the facts in this case.

that his stepdaughter was suicidal when he left his loaded gun on his dresser, even though she had attempted suicide a year and a half prior).

In sum, based on the undisputed facts available to the Defendant at the time he permitted Christina to stay temporarily in his house with an unsecured gun, there is insufficient evidence for a trier of fact to find that Christina's suicide was a reasonably foreseeable probability, so Christina's suicide constitutes a superseding intervening event that cuts off any liability of the Defendant to the Estate. Accordingly, we reverse the Court of Appeals and affirm the trial court's grant of summary judgment in favor of the Defendant.

## CONCLUSION

The decision of the Court of Appeals is reversed, and the trial court's grant of summary judgment is affirmed. Costs on appeal are to be taxed to Appellee Benjamin Shea Cotten, as personal representative for the Estate of Christina Marie Cotten, deceased.

_____
HOLLY KIRBY, JUSTICE