IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2021 Session

DAVID JERNIGAN, AS NEXT OF KIN AND SURVIVING HUSBAND TO JANE ANN
JERNIGAN, DECEASED v. ROBERT EVAN PAASCHE, M.D., ET AL.

Appeal from the Circuit Court for Putnam County
No. 2015-CV-214        Jonathan L. Young, Judge
_____

No. M2020-00673-COA-R3-CV
_____

In this health care liability action, an initial jury trial resulted in a verdict for the defendant physicians. The plaintiff filed a motion for new trial, which the trial court granted. Prior to the second jury trial, the trial court determined that the trial should be bifurcated such that the first phase would address only the applicable standard of care and whether the defendants deviated therefrom, and the second phase would address causation. Following completion of the standard of care phase, the jury again ruled in favor of the defendants. The plaintiff filed a second motion for new trial, which the trial court denied. The plaintiff timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Joe Bednarz, Sr., and Joe Bednarz, Jr., Hendersonville, Tennessee, for the appellant, David Jernigan, as next of kin and surviving husband to Jane Ann Jernigan, deceased.

Daniel H. Rader, IV; Daniel H. Rader, III; and Lane Moore, Cookeville, Tennessee, for the appellee, Robert Evan Paasche, M.D.

Raymond G. Lewallen, Jr., Knoxville, Tennessee, for the appellee, James F. Wojcik, M.D.

## OPINION

### I. Factual and Procedural Background

The plaintiff, David Jernigan, as surviving spouse of Jane Ann Jernigan ("Decedent"), filed a complaint on August 17, 2015, in the Putnam County Circuit Court ("trial court"), alleging wrongful death and health care liability claims against Dr. Robert Evan Paasche; Cumberland Medical Center, Inc. ("Cumberland"); Dr. James F. Wojcik; and Emergency Coverage Corporation. In his complaint, Mr. Jernigan alleged that Dr. Paasche had examined Decedent in the emergency room of the Cookeville Regional Medical Center on August 11, 2012, due to Decedent's complaints of severe abdominal pain and nausea. Dr. Paasche ordered a computerized tomography ("CT") scan and other tests. According to Mr. Jernigan, the CT scan revealed that Decedent suffered from a large paraesophageal hernia.[1] Following the CT scan, Decedent was discharged with medication prescriptions and advised to follow up with her primary care physician within two to three days.

Mr. Jernigan stated in his complaint that Decedent was subsequently taken to the Cumberland emergency room on August 12, 2012, where she was seen by Dr. Wojcik. Dr. Wojcik purportedly noted that Decedent had been to the Cookeville Regional Medical Center emergency room the prior day for the same symptoms of abdominal pain and vomiting. Decedent was discharged after receiving fluids, medication, and Dr. Wojcik's advice that she follow up with her primary care physician that week.

According to Mr. Jernigan's complaint, Decedent was again taken to the Cumberland emergency room, where she presented with severe pain and vomiting. A CT scan performed at that time revealed that Decedent had suffered a perforation with portions of her stomach having herniated into her chest. Mr. Jernigan averred that a surgical procedure was performed on Decedent with the post-operative diagnosis listed as perforated posterior gastric ulcer with peritonitis. Decedent survived the surgery but, tragically, passed away in the recovery room. Mr. Jernigan further averred that Decedent's cause of death was noted to be a perforated gastric ulcer.

Mr. Jernigan alleged that both Dr. Paasche and Dr. Wojcik were negligent for failing to properly diagnose Decedent's condition, failing to obtain a surgical consult following their respective initial examinations of Decedent, and discharging her in an unstable condition. Mr. Jernigan also averred that Cumberland was similarly liable for the above reasons and for failing to provide reasonable care and treatment to Decedent. According to Mr. Jernigan, he believed Dr. Wojcik to be an employee of Emergency

---

[1] The medical experts who testified at trial generally described this condition as an opening in the diaphragm that would allow portions of the esophagus, the stomach, or other organs to enter the chest cavity.

Coverage Corporation, and Mr. Jernigan therefore claimed that Dr. Wojcik's negligence should be imputed to his employer. Mr. Jernigan sought damages for wrongful death and medical negligence in the amount of three million dollars. Mr. Jernigan also noted that his complaint had been refiled pursuant to the savings statute.

Dr. Paasche and Dr. Wojcik each filed respective answers denying liability. Dr. Wojcik additionally denied that he was an employee of Emergency Coverage Corporation. On August 21, 2017, Mr. Jernigan filed an amended complaint, containing additional negligence allegations primarily concerning Dr. Paasche. Both Dr. Paasche and Dr. Wojcik (collectively, "Defendants") answered, with each respectively denying liability. The trial court granted summary judgment in favor of Cumberland and Emergency Coverage Corporation on September 28, 2017.

Although no transcript from the first trial appears in the appellate record, the parties concede and the pretrial hearing transcripts demonstrate that a jury trial was conducted by Judge Amy Hollars in December 2017, resulting in a verdict for Defendants that was subsequently set aside by Judge Hollars's grant of Mr. Jernigan's motion for new trial. On May 23, 2018, Judge Hollars entered an order transferring the matter to Judge Jonathan L. Young for further proceedings.

Following the filing of numerous pretrial motions, the trial court conducted hearings on those motions, during which Mr. Jernigan and Defendants presented substantial argument concerning alleged evidentiary problems during the first trial. As a result of those hearings, the trial court entered an order dated September 13, 2019, directing that the trial would be bifurcated. According to the trial court's order, evidence of liability would be presented first, and "only if the jury returns a verdict finding one or both Defendants negligent, then the jury will hear issues regarding causation." Mr. Jernigan filed a motion seeking reconsideration of the trial court's ruling concerning bifurcation, arguing that such approach would be "impossible to effectively implement and [would] create more problems than it solves." The trial court denied Mr. Jernigan's motion by order dated February 4, 2020, directing that the trial would be bifurcated on the issues of standard of care and causation/damages. The trial court also denied Mr. Jernigan's oral motion for an interlocutory appeal.

The trial court conducted a jury trial spanning five days concerning the issue of standard of care, beginning February 4, 2020, and ending February 10, 2020. The trial court entered a final order on February 13, 2020, incorporating the jury's verdict in favor of Defendants. The jury explicitly found that neither doctor deviated from the recognized standard of acceptable professional practice in his care of Decedent.

On March 15, 2020, Mr. Jernigan filed a motion for new trial, which was opposed by both Dr. Paasche and Dr. Wojcik. Following a telephonic hearing, the trial court

entered an order on April 24, 2020, denying the motion for new trial and awarding discretionary costs to Defendants. Mr. Jernigan timely appealed.

## II. Issues Presented

Mr. Jernigan presents the following issues for this Court's review, which we have restated slightly:

1.  Whether the trial court erred by bifurcating the trial between the issues of standard of care and causation.

2.  Whether trial court erred by excluding Mr. Jernigan's surgical and radiological experts from testifying during the standard of care phase of the trial.

3.  Whether the trial court erred by declining to allow Mr. Jernigan to call rebuttal witnesses.

4.  Whether the trial court erred by permitting blame-shifting.

Dr. Paasche raises the following additional issue:

5.  Whether Mr. Jernigan waived the issue of "blame-shifting" because he failed to object to the alleged improper testimony at trial and failed to identify such testimony in his motion for new trial.

## III. Standard of Review

With regard to bifurcation of issues, our Supreme Court has previously elucidated:

The decision whether or not to sever the issues for the jury must be left to the sound discretion of the trial judge, and the interests of justice will warrant a bifurcation of the issues in only the most exceptional cases and upon a strong showing of necessity. In making its decision the trial court should consider the possibility of juror confusion, the risk of prejudice to either party, and the needs of judicial efficiency. Above all, the issues at trial must not be bifurcated unless the issue to be tried is so distinct and separable from the others that a trial of it alone may be had without injustice.

*Ennix v. Clay*, 703 S.W.2d 137, 139 (Tenn. 1986) (citing *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)).

- 4 -

Concerning the applicable standard of review with regard to the trial court's exclusion of an expert witness's testimony, our Supreme Court has explained:

> Decisions regarding the admissibility of evidence are discretionary, and, therefore, the appellate courts review these decisions using the "abuse of discretion" standard. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). This standard applies to appellate review of decisions by a trial court when it is acting as a gatekeeper with regard to the admissibility of an expert witness's opinion testimony. Accordingly, the appellate courts review decisions regarding the qualifications, admissibility, relevancy, and competency of expert testimony using the abuse of discretion standard. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997).

*Davis v. McGuigan*, 325 S.W.3d 149, 168-69 (Tenn. 2010). As this Court explained in *In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005): "A trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party."

## IV. Bifurcation of Issues

Mr. Jernigan asserts that the trial court erred by bifurcating the trial between the issues of standard of care and causation, arguing that these issues are so intertwined in a health care liability action that they cannot be separated without causing prejudice to the plaintiff. By contrast, Defendants contend that the trial court's bifurcation ruling was within its discretion and resolved certain problems encountered in the case at bar by "focusing the standard of care question on what a reasonably prudent emergency department physician should have done with the information available to him." Upon our review of this issue and the applicable law, we agree with Defendants.

Inasmuch as the decision of whether to bifurcate the issues to be heard by the jury is within the trial court's discretion, such decision is reviewed pursuant to an abuse of discretion standard. *See Ennix*, 703 S.W.2d at 139. As our Supreme Court has explained:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The

abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (internal citations omitted). "[I]f the reviewing court determines that 'reasonable minds can disagree with the propriety of the decision,' the decision should be affirmed." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018)).

In the case at bar, following the grant of Mr. Jernigan's motion for new trial, the parties filed numerous motions seeking to limit or exclude evidence concerning primarily the August 11, 2012 CT scan and how the radiologist's report from that scan should have been interpreted and utilized by Defendants. The trial court conducted hearings regarding these motions on August 12, 2019, and September 5, 2019, during which the parties' respective counsel argued copiously concerning whether certain experts should be allowed to testify and what parameters should be placed upon such testimony. Considerable debate occurred with regard to whether certain evidence was relevant to the standard of care or causation. After hearing these arguments, the trial court made the following observation:

So the only way I can think that we can do anything is maybe bifurcate the trial, and the first time we go and see if he violated the standard of care, send the jury out on that issue. If he didn't violate the standard of care, then obviously we don't even need to get to the causation part.

- 6 -

Although the trial court continued to hear argument on the issue, the court subsequently entered an order on September 13, 2019, bifurcating the issues for trial. Following this ruling, Mr. Jernigan filed a motion seeking reconsideration of the ruling concerning bifurcation, and the trial court considered additional arguments with regard to this issue on January 10, 2020. The trial court denied Mr. Jernigan's motion by order entered February 4, 2020, directing that the trial be bifurcated between the issues of standard of care and causation.[2]

By reason of the unusual circumstances presented in this case, we find no abuse of discretion in the trial court's order that these issues be bifurcated. These parties had previously participated in and completed one jury trial in this matter, which resulted in a defense verdict. Because the trial court's subsequent order granting a new trial does not appear in the record, we do not have the benefit of knowing the court's reasoning for such ruling. However, the parties allude in their appellate briefs to various evidentiary problems experienced during the first trial, which led the parties to file several pretrial motions prior to the second trial concerning expert witnesses and their proposed testimony. Although the trial court heard a substantial amount of argument concerning the evidentiary issues, no consensus was achieved regarding the parameters of the evidence to be introduced. As such, the trial court rendered the discretionary decision to allow the jury to address the standard of care issue initially and separately from the issue of causation in an apparent attempt to establish greater control of the evidence that would be introduced during each phase and presumably to avoid the problems that befell the first trial.

We note that Mr. Jernigan cites no authority for his position that the issues of standard of care and causation "cannot be separated without doing extreme injustice." Our research has likewise revealed no such authority. Based on the exceptional circumstances presented in this case, we disagree with Mr. Jernigan's contention.

Mr. Jernigan argues that "any inquiry into the standard of care necessarily requires an evaluation of the potential cause of a patient's ailment and the consequences of not ruling out the most serious and potentially life threatening cause. Physicians are trained to use this method which is referred to as a differential diagnosis." Assuming, *arguendo*, that these statements are correct, they do not support Mr. Jernigan's position that the issues of standard of care and causation "cannot be separated without doing extreme injustice." Instead, Mr. Jernigan has conflated the concepts of legal causation and the cause in fact of Decedent's damages, *see Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019), with the medical cause of Decedent's ailment.

---

[2] During a subsequent hearing conducted on April 2, 2020, the trial court announced orally that bifurcation was necessary because the case was extraordinary in that one motion for new trial had already been granted, resulting in a retrial. Therefore, the trial court again confirmed its decision to bifurcate the trial.

As our Supreme Court has explained:

> Cause-in-fact, sometimes called actual cause, means "the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Id.* (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). "The concept of 'legal cause' was formerly known as 'proximate cause.' It connotes a policy decision made by the judiciary to establish a boundary of legal liability and to deny liability for conduct that could otherwise be actionable." *Rains* [*v. Bend of the River*], 124 S.W.3d [580,] 592 [(Tenn. Ct. App. 2003)] (citations omitted). "An actor's negligent conduct is the legal cause of harm to another if the conduct is a substantial factor in bringing about the harm and there is no rule of law relieving the actor from liability because of the manner in which the actor's negligence resulted in the harm." *Id.*

*Cotten*, 576 S.W.3d at 638 (footnote omitted). Clearly, the legal concept presented by the causation element is a significantly different concept than the medical cause of Decedent's illness and demise.

With regard to the proof necessary to prevail on a health care liability claim, our Supreme Court has explained in the context of what was then referred to as a medical malpractice claim:

> We have previously observed the "subtle" distinction between medical malpractice and common law negligence recognizing that "medical malpractice is but a species of negligence and no rigid analytical line separates the two." *Gunter v. Lab. Corp. of America*, 121 S.W.3d 636, 639 (Tenn. 2003) (citations omitted). A negligence claim requires proof of "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005).

> Medical malpractice actions are controlled by Tennessee Code Annotated section 29-26-115 (2000), which incorporates the common law elements of negligence. *Gunter*, 121 S.W.3d at 639.

*Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005). Tennessee Code Annotated § 29-26-115 (2012) provides, in pertinent part:

    (a)    In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1)     The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2)     That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3)     As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Of course, "expert proof is required to establish the recognized standard of acceptable professional practice in the profession." *Ellithorpe v. Weismark*, 479 S.W.3d 818, 829 (Tenn. 2015) (citing Tenn. Code Ann. § 29-26-115(b)).

Ergo, proof of the applicable standard of care in a medical defendant's specialty and community and proof that the medical defendant failed to act in accordance with such standard, akin to duty and breach of duty, are distinct elements from causation, or showing that as "a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." *See* Tenn. Code Ann. § 29-26-115(a)(3). A health care liability plaintiff is required to satisfy each of these elements in order to prevail. *See* Tenn. Code Ann. § 29-26-115(a). We find these elements to be "distinct and separable." *See Ennix*, 703 S.W.2d at 139.

As our Supreme Court recognized in *Ennix*: "While a litigant has a constitutional right to have material controverted issues submitted to the jury, our constitution does not mandate that all such issues be submitted to the jury at the same time." *Id*. Rather, in exceptional cases and upon a showing of necessity, the trial court has the discretion to bifurcate the issues before the jury, considering "the possibility of juror confusion, the risk of prejudice to either party, and the needs of judicial efficiency." *See id*.; *see also* Tenn. R. Civ. P. 42.02 ("The court for convenience or to avoid prejudice may in jury trials order a separate trial of any one or more claims, cross-claims, counterclaims, or third-party claims, or issues on which a jury trial has been waived by all parties.").

We determine that the matter before us presents an exceptional case, such that bifurcation of the health care liability elements was necessary. Moreover, it is clear that the trial court afforded appropriate attention to the above considerations listed in *Ennix* when determining that bifurcation was warranted. Although we certainly do not suggest that bifurcation of these issues would be necessary or advisable in every health care liability case, we determine that the trial court did not abuse its discretion in bifurcating

the standard of care and causation issues here because of the unique procedural history presented in this matter and the apparent difficulty experienced by the parties during the original trial. We conclude that (1) the factual basis for the decision was properly supported by evidence in the record, (2) the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) the lower court's decision was within the range of acceptable alternative dispositions. *See Lee Med., Inc.*, 312 S.W.3d at 524. We therefore affirm the trial court's bifurcation ruling.

## V. Evidentiary Issues

Having determined that bifurcation of the health care liability elements was appropriate, we now address Mr. Jernigan's issues concerning the trial court's evidentiary rulings. First, Mr. Jernigan contends that the trial court erred by excluding Mr. Jernigan's surgical and radiological experts from testifying during the standard of care phase of the trial. Second, Mr. Jernigan argues that the trial court erred by declining to allow him to call these same witnesses as rebuttal witnesses during the first phase of the trial. Finally, Mr. Jernigan posits that the trial court erred by allowing Defendants to engage in blame-shifting. We will consider each of these issues in turn.

### A. Exclusion of Expert Witnesses Respecting Surgery and Radiology

Mr. Jernigan asserts that the trial court erred by excluding his expert witnesses regarding surgery and radiology from testifying during the standard of care phase of the trial. As Mr. Jernigan points out, this Court has previously explained that with regard to an expert on standard of care, "there is no requirement that the expert witness be in the same specialty of the medical profession as the defendant; only that the expert be licensed to practice a specialty which makes his testimony relevant to the issues in the case." *Ledford v. Moskowitz*, 742 S.W.2d 645, 647 (Tenn. Ct. App. 1987). Defendants contend that Mr. Jernigan's emergency department experts offered a substantial amount of testimony concerning the appropriate standard of care, including extensive testimony regarding the significance of Decedent's paraesophageal hernia, such that the additional testimony of Mr. Jernigan's surgical and radiological experts would have been cumulative.

In its February 4, 2020 order, the trial court directed that "the parties will be limited to only offering expert testimony from emergency department physicians during the standard of care phase of the trial . . . ." The court specifically ruled that Mr. Jernigan's experts, Dr. Scott Davis, Dr. James Maher, and Dr. Juan Olazagasti, would not be allowed to testify during the standard of care phase. The court further ordered that each party would be permitted to present testimony from two emergency department physician experts and that "allowing any more expert proof regarding alleged violation of standard of care by the Defendants during the standard of care phase of the trial would be cumulative and a waste of the jury's time, in accordance with Tenn. R. Evid. 403."

We emphasize that decisions regarding the exclusion of evidence are reviewed under an abuse of discretion standard. *See Davis*, 325 S.W.3d at 168. Therefore, the decision "should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is otherwise relevant may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In excluding additional expert testimony concerning the standard of care, the trial court found that such evidence would be cumulative and would waste the jury's time pursuant to Tennessee Rule of Evidence 403. Regarding this issue, we note that Mr. Jernigan provided testimony from two expert witnesses during the trial. The first such witness was Dr. Bruce Janiak, who practiced emergency medicine in Augusta, Georgia, and also taught emergency medicine at the Medical College of Georgia. Dr. Janiak testified that he had reviewed the medical records and deposition testimony in this matter, opining that Defendants had violated the applicable standard of care. With regard to Dr. Paasche, Dr. Janiak indicated that based upon the finding in the original CT scan of a paraesophageal hernia and the symptoms Decedent was exhibiting, a surgical consult was necessary to determine whether Decedent had an emergent issue that required surgical intervention. Dr. Janiak explained that a paraesophageal hernia could result in portions of the stomach and intestines "pushing up" through the diaphragm into the chest cavity and that if this problem was sufficiently severe, the patient would require immediate surgery.

With respect to Dr. Wojcik, Dr. Janiak articulated that Dr. Wojcik should have been concerned because Decedent had been seen in the emergency room the previous day and was reporting continued pain and vomiting. Dr. Janiak elucidated that patients making repeated visits to the emergency room were statistically at higher medical risk than those appearing for a first visit. Dr. Janiak further stated that Dr. Wojcik violated the standard of care by discharging Decedent with knowledge that she had a paraesophageal hernia and with the noted history of her recent, recurring symptoms.

Dr. Janiak generally opined that an emergency room physician should know the difference between a "typical" hiatal hernia and a paraesophageal hernia. Dr. Janiak

explained that the CT finding of "large paraesophageal hernia with left basilar area of compressive atelectasis" meant that there was a large part of the stomach that was in the chest cavity pressing on the lungs. Dr. Janiak agreed that a paraesophageal hernia was a type of hiatal hernia, albeit a "very large" one. Dr. Janiak testified that it was appropriate and within the applicable standard of care for an emergency department physician to rely on the CT scan report. He also stated, however, that emergency department physicians could not rely on the radiologist to make a diagnosis; rather, the physician had to read the radiology report and observe the patient's clinical presentation in order to properly diagnose.

Dr. Bill Lunders also testified as an expert witness on behalf of Mr. Jernigan. Dr. Lunders testified that he lived in Smyrna, Tennessee, where he practiced emergency medicine. Having reviewed the medical records and depositions in this matter, Dr. Lunders also opined that Defendants had violated the applicable standard of care. Dr. Lunders stated that the finding of basilar atelectasis in conjunction with a paraesophageal hernia demonstrated that the hernia was so large that it was "pushing on the left lung causing it to have some collapse." Dr. Lunders explained that a hernia could be either sliding or paraesophageal, and he elucidated that the report of a large paraesophageal hernia was an abnormality. He further explained that the only treatment for a paraesophageal hernia was surgery. Dr. Lunders opined that with Decedent's symptoms and the CT finding of a paraesophageal hernia, the standard of care required that Dr. Paasche seek a surgical consult.

With regard to Dr. Wojcik and the second emergency room visit, Dr. Lunders stated that when a patient complains of abdominal pain and returns to the emergency room for a second time, the emergency room physician should immediately assume that "something was missed." Dr. Lunders indicated that due to Decedent's symptoms, the results of her laboratory tests, and the earlier CT scan report showing a paraesophageal hernia, Dr. Wojcik also violated the standard of care by failing to obtain a surgical consult. Dr. Lunders further opined that if the paraesophageal hernia had been surgically repaired as it should have been, Decedent would not have died. Dr. Lunders acknowledged, however, that the emergency room physicians appropriately relied on the radiologist's report from a CT scan of the abdomen. Dr. Lunders also acknowledged that an asymptomatic paraesophageal hernia could wait for surgery at a later date.

As this Court has previously explained concerning a trial court's exclusion of evidence:

> An erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted. *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987). Reviewing courts cannot make this determination without knowing what the excluded evidence would have been. *Stacker v. Louisville & N. R.R.*

*Co.*, 106 Tenn. 450, 452, 61 S.W. 766 (1901); *Davis v. Hall*, 920 S.W.2d 213, 218 (Tenn. Ct. App. 1995); *State v. Pendergrass*, 795 S.W.2d 150, 156 (Tenn. Crim. App. 1989). Accordingly, the party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered evidence was reversible error. Tenn. R. Evid. 103(a)(2); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986); *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991). Appellate courts will not consider issues relating to the exclusion of evidence when this tender of proof has not been made. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833-34 (Tenn. Ct. App. 1997).

As stated, an offer of proof must contain the substance of the evidence and the specific evidentiary basis supporting the admission of the evidence. Tenn. R. Evid. 103(a)(2). These requirements may be satisfied by presenting the actual testimony, by stipulating to the content of the excluded evidence, or by presenting an oral or written summary of the excluded evidence.

*Hampton v. Braddy*, 270 S.W.3d 61, 65 (Tenn. Ct. App. 2007) (quoting *Thompson v. City of LaVergne*, No. M2003-02924-COA-R3-CV, 2005 WL 3076887, at *9 (Tenn. Ct. App. Nov. 16, 2005), *perm. app. denied* (Tenn. Apr. 24, 2006)). "[T]he failure of [a party] to make an offer of proof constitutes a waiver of the right to challenge the exclusion of this testimony." *Id*.

In the case at bar, Mr. Jernigan did make an offer of proof regarding the excluded testimony of his surgical and radiological experts, Drs. Davis, Olazagasti, and Maher, following the trial court's denial of his request to allow these experts to testify as rebuttal witnesses during the first phase of the trial.[3] We have, therefore, reviewed the offer of proof in order to determine whether the trial court's exclusion of the proffered evidence constituted reversible error. *See id*. Following our thorough comparison of this testimony with the testimony provided at trial, as summarized above, we conclude that the trial court did not err in excluding the proffered evidence as cumulative. *See* Tenn. R. Evid. 403.

For example, Dr. Maher testified that he practiced as a surgeon in Virginia and taught as a professor of surgery at Virginia Commonwealth University. Following his review of the medical records and depositions in this matter, Dr. Maher opined that Decedent's untreated paraesophageal hernia led to her stomach rupturing, which

---

[3] Mr. Jernigan presented Dr. Davis's testimony via deposition, and the respective testimonies of Drs. Maher and Olazagasti were taken from the transcript of the first trial.

ultimately caused her demise. Dr. Maher specifically stated that he was not rendering an opinion regarding the standard of care applicable to emergency department physicians, although he did relate that he was familiar with such standard. Dr. Maher discussed various types of hernias and, like Dr. Lunders, opined that a symptomatic paraesophageal hernia constituted an emergent condition requiring prompt surgical repair. Although Dr. Maher testified that he did not disagree with the radiologist's report from the CT scan, he opined that the CT scan showed fluid in the stomach indicating some level of gastric obstruction not listed in the findings.

Dr. Olazagasti testified that he practiced radiology in Virginia, and he indicated that he likewise was not offering an opinion regarding the standard of care applicable to emergency department physicians. Dr. Olazagasti acknowledged that although the CT scan report did not indicate the existence of an emergent situation, a physician needed to correlate that report with the patient's history and clinical presentation to render a proper diagnosis. We note that Dr. Janiak testified similarly.

Dr. Davis testified that he was a surgeon who practiced in Atlanta. Dr. Davis also stated that he was not providing an opinion regarding the standard of care applicable to emergency department physicians. Dr. Davis testified that he did not know what the standard of care required of emergency department physicians tasked with reviewing CT scans. Dr. Davis acknowledged that if an emergency department physician said that such physician could rely on the radiologist's report from the CT scan, Dr. Davis could not dispute that assertion.

Dr. Davis opined that although there was technically "nothing wrong" with the CT scan report, it did not "raise the level of concern needed" in this case. However, Dr. Davis testified that he would expect an emergency department physician to rely on such report, and if an obstruction or volvulus, explained to be a twisting of the stomach, were present, he would expect the report to reflect that. Dr. Davis's primary criticism of Defendants' actions in this matter, much like Dr. Janiak's stated criticism, was that Defendants failed to correlate Decedent's clinical presentation with the CT scan findings.

Based upon our review of the testimony presented at trial and the testimony contained in the offer of proof, we determine that the proffered testimony from Drs. Maher, Olazagasti, and Davis would have been cumulative to the testimony offered concerning the applicable standard of care. Although these witnesses generally testified concerning different types of hernias and the consequences of each, such evidence was already presented through Dr. Lunders's testimony. Each of the three proffered witnesses opined that Defendants should have correlated the CT findings with Decedent's clinical presentation and medical history to determine that a surgical consult was needed, a position advanced by both Dr. Lunders and Dr. Janiak. Importantly, none of the testimony contained in the offer of proof provided evidence concerning the standard of care applicable to emergency department physicians, because each respective witness

declined to offer such opinion. We reiterate that "[a]n erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted." *Hampton*, 270 S.W.3d at 65. Upon careful review, we conclude that the proffered evidence would not have affected the outcome of the trial had it been admitted.

On appeal, Mr. Jernigan also argues that he should have been allowed to present these witnesses as rebuttal witnesses in order to rebut points made during the testimony of Defendants' expert witnesses during the first phase of the trial. Mr. Jernigan contends that Defendants were allowed to provide testimony that the radiologist "was a very good radiologist" and that "if there was a volvulus or obstruction he would have said so." Mr. Jernigan further contends that Defendants' experts were allowed to "misle[a]d the jury into believing that this was a common problem in the emergency room and no reason for concern," and he argues that "the jury needed to hear what was seen on the CT scan," which could purportedly only be explained by the experts in surgery and radiology. We disagree with Mr. Jernigan's postulate.

As Defendants point out, rebuttal evidence is intended to "explain or controvert evidence produced by an adverse party." *Godbee v. Dimick*, 213 S.W.3d 865, 877 (Tenn. Ct. App. 2006). Having reviewed the proffered rebuttal evidence, we note that this testimony did not controvert testimony that the radiologist report was accurate or that a volvulus or obstruction likely would have been noted. In fact, Mr. Jernigan's proffered rebuttal experts essentially agreed with these points. As stated previously, Mr. Jernigan's experts who did testify were allowed to provide their opinions that Decedent's condition should have been recognized as emergent, similar to the opinions of Mr. Jernigan's rebuttal experts. Moreover, Dr. Janiak and Dr. Lunders each respectively testified concerning how the CT scan should have been considered and interpreted by the emergency department physicians. In addition, Dr. Lunders specifically testified that the report of a large paraesophageal hernia was an abnormality.

Again, we conclude that because the proffered evidence would not have affected the outcome of the trial had it been admitted, the trial court did not err in excluding it. *See Hampton*, 270 S.W.3d at 65. Furthermore, with regard to Mr. Jernigan's contention that Defendants were improperly allowed to present testimony that purportedly touched on the causation issue during the first phase of the trial, we note that Mr. Jernigan's counsel failed to contemporaneously object to the testimony during trial and thus has waived the ability to do so on appeal. *See Goss v. Hutchins*, 751 S.W.2d 821, 827 (Tenn. 1988) (citing *Layne v. Speight*, 529 S.W.20 209 (Tenn. 1975)). We therefore affirm the trial court's evidentiary rulings.

## B. Blame-shifting

Finally, Mr. Jernigan posits that the trial court erred by allowing Defendants to present certain testimony in an attempt to shift blame for their actions to Dr. Josue

Montanez, the radiologist who performed the CT scan on Decedent. Mr. Jernigan contends that by allowing testimony that an emergency room physician had a right to rely on a radiologist to properly read the CT scan or to rely on the radiologist's report, the trial court allowed the Defendants to shift the blame to Dr. Montanez, who was not a defendant in this action. Mr. Jernigan asserts that such evidence should have been excluded, pursuant to Tennessee Rule of Evidence 403, as irrelevant and unfairly prejudicial.

As a threshold matter, Dr. Paasche asserts that Mr. Jernigan has waived this issue because he failed to object to the alleged improper testimony at trial and failed to identify such testimony in his motion for new trial. We agree that Mr. Jernigan failed to contemporaneously object to the testimony during trial and accordingly has waived the ability to do so on appeal. *See Goss*, 751 S.W.2d at 827. We also determine that the evidence that Mr. Jernigan now seeks to exclude was provided in part by his own experts. For example, Dr. Janiak testified that it was appropriate and within the applicable standard of care for an emergency department physician to rely on the CT scan report. His criticism of Defendants was that emergency department physicians could not rely on the radiologist to make a diagnosis; rather, the physician had to read the radiology report and look at the patient's clinical presentation in order to properly diagnose a patient. Dr. Lunders's testimony was substantially similar. As such, we determine Mr. Jernigan's issue in this regard to be waived because the testimony that he sought to exclude was provided in part by his own experts without his objection. *See* Tenn. R. App. P. 36 ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Moreover, with regard to the concept of blame-shifting, we note that neither Dr. Paasche nor Dr. Wojcik attempted to shift the blame to Dr. Montanez by presenting proof that the CT report was inaccurate or that Dr. Montanez was negligent in some manner. In fact, Dr. Sullivan Smith, one of Dr. Paasche's expert witnesses, testified that he worked with Dr. Montanez, and he characterized Dr. Montanez as "very good" and "thorough." Likewise, Dr. Paasche testified that Dr. Montanez was "a very thorough radiologist." In addition, Dr. Paasche specifically stated that he was not relying on Dr. Montanez to do Dr. Paasche's job of diagnosing Decedent's condition. We determine Mr. Jernigan's arguments regarding blame-shifting to be unavailing.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. Costs on appeal are assessed to the appellant, David Jernigan, as next of kin and surviving husband to Jane Ann Jernigan, deceased.  This case is remanded to the trial court for enforcement of the judgment and collection of costs assessed below.


s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE